## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SCOTT FERRIS, JODI FERRIS, and A.F., a minor, by her parents, | ) ) ) | CIVIL ACTION NO.: |
| *Plaintiffs* | ) ) | |
| v. | ) ) | **COMPLAINT** |
| MILTON S. HERSHEY MEDICAL CENTER; CAITLIN J. MALLIS, M.D., IAN M. PAUL, M.D., and JOHN DOE, M.D., physicians; JANE DOE, R.N., JANET DOE, R.N., registered nurses; JOHN ROE and JANE ROE, hospital staff members; JANET ROE and JACK ROE, risk management personnel, personally and in his official capacity; OFFICER RIAN BELL and OFFICER JAKE ROE, Derry Township police officers; and ANGELICA LOPEZ-HEAGY, a social worker, personally and in their official capacities; DAUPHIN COUNTY SOCIAL SERVICES FOR CHILDREN AND YOUTH, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** <br><br> **[Electronically filed]** |
| *Defendants* | ) | |

## COMPLAINT

## INTRODUCTION

This is a civil action commenced pursuant to 42 U.S.C. § 1983 to redress the

deprivation by the Defendants of rights secured to Plaintiffs under the Fourteenth

Amendment to the United States Constitution which occurred when the Defendants

took custody of the Plaintiffs' daughter A.F. without lawful authority.

Because of the illegal and unconstitutional actions of the Hershey S. Milton Medical Center, its physicians, nurses, and staff, Dauphin County Social Services for Children and Youth, and social worker Angelica Lopez-Heagy, Plaintiffs Scott and Jodi Ferris' daughter, A.F., was removed from their custody for the first few days of her life. In fact, the Ferris's were forced to spend the first night of her life huddled up in their car in the parking lot across the street from the hospital, all because the hospital would not answer her parents' questions about A.F.'s medical treatment.

## JURISDICTION AND VENUE

1. The Plaintiffs, Scott and Jodi Ferris, individually and as parents and next friends of A.F., born 2010, who reside in Dauphin County at a confidential address with a mailing address of P.O. Box 2465 #198, Harrisburg PA 17105, bring this civil rights lawsuit pursuant to 42 U.S.C. § 1983 to redress the deprivation by the Defendants under color of state law of rights secured to them under the Fourteenth Amendment to the United States Constitution.

2. Jurisdiction over the first and second causes of action is conferred on this court by 28 U.S.C. § 1343(3) and 1343(4), which provides for original jurisdiction in this court over all suits brought pursuant to 42 U.S.C. § 1983. Jurisdiction is also

conferred on this court by 28 U.S.C. § 1331(a) because the cause of action arises under the Constitution and laws of the United States.

3.  Jurisdiction over the third, fourth, and fifth causes of action is conferred on this court by 28 U.S.C. § 1367(a), which provides this court with supplemental jurisdiction over all claims which are so related to the claims in the first and second causes of action that they form part of the same case or controversy under Article III of the United States Constitution.  Supplemental jurisdiction over these claims is appropriate because the claims stated in the third, fourth, and fifth causes of action arise from the same nucleus of operative facts as the claims over which this court has original jurisdiction.

4.  Venue properly lies in this Court pursuant to 28 U.S.C. § 1391 in that all of the parties reside in this federal district.

## PARTIES

5.  Scott and Jodi Ferris are citizens of the United States who reside in Williamstown, Pennsylvania.

6.  Scott and Jodi Ferris are the parents of A.F.

7.  Defendant Milton S. Hershey Medical Center is a state institution and federal fund recipient with an address of 500 University Drive, Hershey, Dauphin County, Pennsylvania, 17033.

8.  Upon information and belief, Defendant Caitlin J. Mallis, M.D., was at all pertinent times herein an employee of Defendant Hershey Medical Center and was at all pertinent times herein on or about its business in the course and scope of her employment.

9.  Upon information and belief, Defendant Ian M. Paul, M.D., is an employee of Defendant Hershey Medical Center and was at all pertinent times herein on or about its business in the course and scope of his employment.

10. Upon information and belief, Defendant John Doe, M.D., is an employee of Defendant Hershey Medical Center and was at all pertinent times herein on or about its business in the course and scope of his employment.

11. Upon information and belief, Defendant Nurse Jane Doe is an employee of Defendant Hershey Medical Center and was at all pertinent times herein on or about its business in the course and scope of her employment.

12. Upon information and belief, Defendant Nurse Janet Doe is an employee of Defendant Hershey Medical Center and was at all pertinent times herein on or about its business in the course and scope of her employment.

13. Upon information and belief, Defendant Hospital Staff John Roe is an employee of Defendant Hershey Medical Center and was at all pertinent times herein on or about its business in the course and scope of his employment.

14. Upon information and belief, Defendant Hospital Staff Jane Roe is an employee of Defendant Hershey Medical Center and was at all pertinent times herein on or about its business in the course and scope of her employment.

15. Upon information and belief, Defendant Risk Management Personnel Jack Roe is an employee of Defendant Hershey Medical Center and was at all pertinent times herein on or about its business in the course and scope of his employment.

16. Upon information and belief, Defendant Officer Rian Bell is an employee of the Derry Township Police Department and was at all pertinent times herein on or about its business in the course and scope of her employment.

17. Upon information and belief, Defendant Officer Jake Roe is an employee of the Derry Township Police Department and was at all pertinent times herein on or about its business in the course and scope of his employment.

18. Upon information and belief, Defendant Social Worker Angelica Lopez-Heagy is an employee of Defendant Dauphin County Social Services for Children and Youth and was at all pertinent times herein on or about its business in the course and scope of her employment.

19. Upon information and belief, Defendant Dauphin County Social Services for Children and Youth is a state agency with an address of 1001 North

6th Street, Harrisburg, PA 17102, and is responsible for investigating claims of child abuse and neglect.

## FACTS

20. On Monday, June 21, 2010, Jodi Ferris was almost nine months pregnant.

21. Jodi and her husband Scott went to a prenatal appointment with Certified Professional Midwife Dhyana Heller.

22. Although Scott and Jodi wanted to use Heller as their midwife to attend the birth, they needed some extra time to make financial arrangements.

23. Heller offered to consult by phone if they were unable to find another midwife and if Jodi went into labor at home.

24. By 7:00 a.m. on Sunday, June 27, Jodi's labor contractions had intensified to the point that she asked Scott to call Midwife Heller.

25. Heller told Scott that based on Jodi's condition, it appeared to her that she might not be able to get to the Ferris' house before the birth.

26. Heller discussed options with the Ferrises, including whether to drive to the hospital, call an ambulance, or have an unattended birth at home.

27. Heller encouraged Scott and Jodi to make the decision quickly for themselves.

28. There are four hospitals in the area, all about one hour from the Ferris' house: Penn State Hershey Medical Center; PinnacleHealth – Harrisburg Pennsylvania Hospital & Healthcare System; Sunbury Community Hospital; and Schuylkill Medical Center – South Jackson Street.

29. Jodi called 911 and asked for an ambulance to be sent.

30. The ambulance took Jodi to Hershey Medical Center.

31. Just after the ambulance stopped at the emergency room door of Hershey Medical Center, Jodi's daughter A.F. was born in the ambulance.

32. While Jodi and A.F. were being transported by stretcher into the hospital, Jodi kept asking questions as to how the baby was doing.

33. There were at least six hospital staff persons surrounding Jodi.

34. The hospital staff never answered Jodi's questions.

35. Dr. John Doe came into the room and obtained some basic medical history from Jodi.

36. Dr. John Doe expressed hostility toward using midwives and/or home deliveries.

37. Defendant Nurse Jane Doe approached Jodi with a hypodermic needle.

38. When Jodi asked her what the needle was, Nurse Jane Doe said, "It's just a shot."

39. Jodi again asked her what the shot was, and Nurse Jane Doe said, "It's just to help."

40. Jodi asked a third time what the shot was, and Nurse Jane Doe said, "It's for the placenta."

41. Jodi asked a fourth time what the shot was, and Nurse Jane Doe stuck the needle in Jodi's left arm and injected her.

42. Only then did Nurse Jane Doe say, "Oh, it's just oxytocin."

43. After Nurse Jane Doe had injected the medication needle in Jodi's arm, another staff person asked Jodi, "You aren't allergic to that, are you?"

44. Jodi again tried to obtain information on her daughter's condition, but no one would answer her questions.

45. Defendant Nurse Jane Doe and another nurse then grabbed Jodi's left arm and started to insert an IV.

46. Jodi asked, "Why do I need an IV?"

47. Defendant Nurse Jane Doe stated, "You don't. Now hold still so I can get this in you."

48. Jodi removed her arm from their grasp and informed the nurses that she did not want an IV if she did not need it.

49. Defendant Nurse Jane Doe ignored Jodi and grabbed her arm again.

50. Jodi again asked why she needed an IV.

51. Defendant Nurse Jane Doe stated, "Just in case."

52. Jodi asked, "In case of what?"

53. Jane Doe stated, "In case you need surgery."

54. Jodi asked why she would need surgery.

55. Jane Doe stated, "You don't need surgery. Now give me your arm."

56. Defendant Nurse Jane Doe stated that Jodi had to have the IV inserted "because hospital policy requires it, regardless of the patient's wishes."

57. Jane Doe repeatedly told Jodi they had no reason at all to expect that she would need an IV, but insisted they had to follow hospital policy, regardless of her wishes.

58. Jodi told both Jane Doe and the other attending nurse, "I told you no. I don't want an IV unless I need one."

59. Jodi asked what the baby's APGAR scores were, but no one would tell her.

60. Defendant Hospital staff John Roe took the baby out of the room.

61. When Jodi asked where the baby was being taken, John Roe would not tell her, instead saying, "She's in good hands. You'll be able to see her soon."

62. Some time later, Defendant Nurse Janet Roe told Jodi that the baby should be ready to go home soon.

63. Defendant Doctor Caitlin Mallis told Jodi at 10:30 a.m. that the baby was doing really well and that the nurses would bring the baby to her soon.

64. Dr. Mallis said that the baby's APGAR score right then would be "9."

65. Defendant Doctor John Doe then told Jodi that the baby was "very sick" and would have to stay in the hospital.

66. Dr. Doe again expressed hostility toward midwives and said, "Too many people think they know what they're doing."

67. When the hospital staff brought the baby to Jodi at 11:40 a.m., Defendant Hospital Staff Member Jane Roe said, "The baby is doing good. She will be able to go home in no time."

68. Several hours later, however, Defendant Hospital Staff Member John Roe told them that the baby was going to have to stay in the hospital for 48-72 hours for observation.

69. John Roe would not answer Scott and Jodi's questions as to why the baby needed to stay.

70. John Roe told Jodi that the baby was fine and healthy.

71. John Roe told Jodi that "the law requires us to keep the baby for 48 hours."

72. When Jodi asked for the statute requiring this, John Roe told Jodi, "You'll have to get that from Risk Management."

73. John Roe told Jodi that "Risk Management wants the baby to stay admitted."

74. Defendant Risk Management Member Janet Roe told Jodi, "The baby is healthy and I do not anticipate any health problems with her over the next 48-72 hours, and so the baby cannot be discharged because we need to keep her for observation, as it is unsafe for her to leave the hospital."

75. Defendant Risk Management Member Jack Roe told Jodi it was "Risk Management policy" to keep "babies like this" for 48 to 72 hours.

76. Jack Roe never explained what he meant by "babies like this."

77. Jack Roe said that the Risk Management policy was not about managing the risk of medically at risk patients, but managing the risks that the hospital might get sued if they discharged a healthy baby where something goes wrong after discharge.

78. The hospital staff, upon request, provided Scott and Jodi with its policy for discharge after 24 hours and agreed to work with them to get the baby discharged in 24 hours.

79. The hospital staff told Jodi that she would be moved to a new room in the nursery area and confirmed that Scott and Jodi could stay with the baby in Jodi's room through the night.

80. Jodi asked the hospital staff whether her older girls could spend the night in the nursery.

81. The hospital staff told Jodi that children are allowed to visit the nursery, but not spend the night.

82. Between 3:00 and 4:00 P.M., Defendant social worker Angelica Lopez-Heagy came into Jodi's room.

83. The social worker told Jodi that she was there to conduct an investigation.

84. Jodi asked to see the social worker's I.D. badge and a copy of the allegations.

85. Defendant social worker told Jodi that she could not tell her what the allegations were until her investigation was complete.

86. Jodi insisted that she wanted to see a copy of the allegations.

87. Defendant social worker told Jodi that she did not have a copy of the allegations, and that even if she did, it would be "against the law for me to show them to you."

88. Jodi told the social worker that she was not comfortable speaking with the social worker if she did not know the allegations.

89. The social worker told Jodi, "Since you're not going to cooperate, I'll just go and call the police and we can take custody of the baby."

90. Jodi informed the social worker that she was willing to cooperate.

91. The social worker then gave a vague description of allegations that Jodi was "refusing to provide medical treatment."

92. The social worker did not specify which "medical treatment" Jodi had refused to provide.

93. The social worker claimed that Jodi had refused to allow a vitamin K shot to be administered to her daughter.

94. Jodi had never been asked about a vitamin K shot.

95. Jodi had heard hospital staff in the ER talking about already having administered a vitamin K shot to A.F.

96. Neither the social worker nor the hospital staff gave specific examples of medically-necessary treatment that Scott and Jodi refused.

97. Scott left the hospital to feed and care for the older children, and leave them with relatives.

98. After Scott left, the social worker came back into the room and stated that if Jodi did not agree to all the hospital's procedures, she would call the police and take custody of the baby.

99. The hospital staff told Jodi that they had to test the baby for Group B Strep before the lab closed at 6:00 P.M.

100.    The hospital staff told Jodi that they would not release the baby for 72 hours because "her GBS status is unknown."

101.    Defendant Doctor Caitlin Mallis stated that she would still agree to discharge in 24 hours if Jodi would allow the hospital to check the baby's white blood cell count.

102.    Jodi agreed to this check.

103.    The hospital staff claimed that they needed to give the baby a shot for Hepatitis B.

104.    Jodi asked the hospital to check her before checking the baby for Hepatitis B before giving the shot.

105.    The hospital staff claimed that the lab was going to close in a few minutes, and that they could have done the test earlier in the day, but hadn't thought of it.

106.    However, the hospital staff agreed to take a blood sample from Jodi to test for Hepatitis B.

107.    No blood sample was ever actually taken from Jodi by the hospital staff.

108.    The social worker asked Jodi if there were any religious beliefs that were influencing her decision to refuse necessary medical treatment for her daughter.

109.    Jodi denied that she was refusing medical treatment, except for the HepB shot, which was not necessary unless the baby tested positive.

110.    Jodi explained that her reluctance to have the HepB shot was a religiously motivated decision, but that she didn't want to talk about her faith until Scott returned.

111.    The social worker said that if Jodi would not talk to her, she would call the police and have them take custody of the baby.

112.    The social worker stated that this was an unusual case because "there is no neglect or abuse," but that she still had to investigate and had to have Scott and Jodi sign a safety plan because of the call made to their office.

113.    The social worker stated that she was going to require Jodi to sign a safety treatment plan agreeing to everything that the hospital staff was going to do to the baby, and if Jodi did not sign it, she would call the police to have them take custody of the baby.

114.    Jodi stated that she would not be comfortable signing anything without talking to an attorney first.

115.    The social worker refused and stood up to go call the police.

116.    Jodi then asked if she could wait to sign until her husband returned later that evening.

117.   The social worker said, "No, I've been here three hours working on this case, and I'm not waiting any longer.  If he's back by the time we get it written up, I'll let him read it, otherwise, if you don't sign the safety plan, I'm calling the police and having them take custody of the baby."

118.   The social worker then left the room.

119.   Upon information and belief, the social worker contacted Defendant Officer Rian Bell, a law enforcement officer with the Derry Township Police Department.

120.   Upon information and belief, the social worker asked Officer Bell to take emergency custody of A.F., without prior judicial authorization.

121.   Upon information and belief, based on the allegations of the social worker, Officer Bell concluded that "there are reasonable grounds to believe the child [A.F.] is suffering from illness or injury, or is in imminent danger from her surroundings, and that her removal is necessary."

122.   Upon information and belief, Defendant Officer Bell then released emergency custody of A.F. to Defendant social worker for further placement.

123.   Upon information and belief, neither Defendant Officer Bell nor Defendant social worker received prior judicial approval before taking custody of A.F.

124.   Defendant social worker then returned to the room with Defendant Officer Bell, Defendant Officer Jake Roe, and several hospital staff.

125.   The social worker said that she was taking custody of A.F. because Jodi would not sign the safety plan.

126.   Jodi told the social worker she had never seen a copy of the safety plan, and that she needed to see it before signing it.

127.   When Jodi asked for a pen to sign it, the social worker said, "That window has closed."

128.   Defendant social worker took physical custody of A.F.

129.   Defendant Nurse Janet Doe removed A.F. from Jodi.

130.   The social worker then authorized the hospital to administer the HepB shot, even though the blood test that the hospital staff had agreed to do first was not done.

131.   The police escorted Jodi off the premises of the hospital.

132.   The police and Jodi met Scott coming into the hospital entrance, loaded down with blankets and pillows because he was planning to spend the night in the hospital.

133.   The police escorted Scott and Jodi off the premises of the hospital.

134.   Jodi was told that she would be allowed to come back to the hospital every three hours during the night to feed the baby, but the hospital staff did not always allow Jodi access to A.F. every three hours.

135.   After 30 minutes of feeding, hospital security escorted Jodi off the hospital grounds, even if A.F. had not eaten or finished nursing.

136.   Jodi and Scott spent the night sleeping across the road in their car in a parking lot.

137.   The security officer who escorted them off the premises after the 8:00 a.m. feeding told them that they were not the first family he had seen that the hospital had treated this way.

138.   While separated from her parents, A.F. received medical testing and procedures from Defendant Doctor Ian M. Paul.

139.   Scott and Jodi did not consent to Dr. Paul's treatment of A.F.

140.   At the court shelter care hearing the next morning, custody was immediately returned to the parents.

141.   When Scott and Jodi returned to the hospital to recover A.F., they were sent to a room by themselves for the majority of the visit.

142.   When Scott and Jodi finally had a chance to observe A.F., her heels were severely bruised from many needle injections.

143.   For the first month of her life, A.F. would flinch and cry whenever she was touched below the knee.

144.   Several days later, just before discharge, Scott and Jodi observed that A.F. had jaundice.

145.   Scott and Jodi mentioned to Defendant Doctor Paul that A.F. had jaundice.

146.   Dr. Paul told Scott and Jodi that he had not treated A.F. for jaundice.

147.   Dr. Paul told Scott and Jodi that the Ferris's pediatrician, Dr. Blutstein, had called Dr. Paul to ask that Hershey Medical Center treat A.F. for jaundice.

148.   Dr. Paul told Scott and Jodi that he had refused to treat A.F. for jaundice, contrary to the request of Dr. Blutstein.

149.   Prior to being discharged from the hospital, A.F. received no treatment for jaundice from Dr. Paul, or from any other pediatrician employed by Defendant Hershey Medical Center.

150.   After being discharged from the hospital, A.F. had a pediatrician appointment with Dr. Blutstein.

151.   Dr. Blutstein diagnosed A.F. with jaundice.

152.   Because A.F.'s jaundice levels were too high and had been rising too quickly, Dr. Blutstone conducted numerous blood draws and blood tests on A.F.

153. A.F.'s jaundice was so severe that A.F. had to be admitted to PinnacleHealth Harrisburg Hospital two days after discharge for further medical treatment.

154. Upon information and belief, almost none of the procedures that hospital staff had described as "medically necessary" were actually performed.

155. At the dependency adjudication July 7, the case was dismissed.

156. The court returned full physical and legal custody to Jodi and Scott Ferris.

## FIRST CAUSE OF ACTION

157. The allegations contained in paragraphs 1 through 156 are hereby realleged and incorporated by reference herein.

158. The removal of A.F. from her parents' custody was a violation of Plaintiffs' Fourteenth Amendment right to procedural due process in that there was no emergency circumstance to justify deprivation of custody without parental consent or a court order.

159. Defendants Officer Rian Bell, Officer Jake Roe, Angelica Lopez-Heagy and Dauphin County Social Services for Children and Youth violated clearly established statutory or constitutional rights of which a reasonable person in their position should have known.

## SECOND CAUSE OF ACTION

160.   The allegations contained in paragraphs 1 through 156 are hereby realleged and incorporated by reference herein.

161.   The coerced seizure of A.F. without a warrant, court order, or evidence of exigent circumstances was a violation of the Plaintiffs' Fourth Amendment right to be secure in their person against unreasonable seizures.

## THIRD CAUSE OF ACTION

162.   The allegations contained in paragraphs 1 through 156 are hereby realleged and incorporated by reference herein.

163.   Defendants Hershey Medical Center, Dr. Ian M. Paul, and staff of Hershey Medical Center violated Pennsylvania common law by physically battering A.F. by conducting medical procedures on A.F. without the consent and over the objection of A.F.'s parents, Scott and Jodi Ferris.

164.   Defendants' tortious conduct proximately caused A.F. injury.

## FOURTH CAUSE OF ACTION

165.   The allegations contained in paragraphs 1 through 156 are hereby realleged and incorporated by reference herein.

166.   Defendants Hershey Medical Center, Angelica Lopez-Heagy, Officer Rian Bell, and Officer Jake Roe violated Pennsylvania common law by falsely imprisoning A.F. by unlawfully detaining her without the consent and over the objection of A.F.'s parents, Scott and Jodi Ferris.

## FIFTH CAUSE OF ACTION

167.   The allegations contained in paragraphs 1 through 156 are hereby realleged and incorporated by reference herein.

168.   Defendants Hershey Medical Center, Dr. Caitlin J. Mallis, Dr. Ian M. Paul, Dr. John Doe, Nurse Jane Doe, Nurse Janet Doe, John Roe, Jane Roe, Janet Roe, Jack Roe, Officer Rian Bell, Officer Jake Roe, and Angelica Lopez-Heagy are liable for the tortious infliction of emotional distress because their intentional or reckless conduct toward A.F. was so extreme and outrageous as to cause severe emotional distress to A.F., and to Scott and Jodi Ferris, A.F.'s parents.

## DAMAGES

169.   Plaintiffs allege that as a result of the violations of their civil rights described above each has suffered and will continue to suffer for an as yet undetermined length of time from the following:

      a.  Severe emotional distress;

      b.  Emotional Distress; and

      c.  Loss of enjoyment of life.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that this court:

1) Find that the defendants intentionally and illegally violated the Plaintiffs' constitutional rights;

2) Award compensatory damages in favor of the Plaintiffs, including A.F.;

3) Award punitive damages for Defendants' conduct in willful and wanton disregard for the rights of the Plaintiffs;

4) Award Plaintiffs costs and attorney's fees pursuant to 42 U.S.C. § 1988; and

5) Grant the Plaintiffs such other relief as may be deemed just and proper.

Dated this 9th day of March, 2012.

Respectfully submitted,

Scott Ferris
Jodi Ferris
   *Plaintiffs*


/s/ Matthew D. Menges
**Matthew D. Menges, Esq.,**
**PA208132**
**Joshua B. Bodene, Esq.,**
**PA201513**
Menges & McLaughlin, P.C.
145 East Market Street
York, PA 17401
Phone: 717-843-8046
Fax: 717-854-4362