## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SCOTT FERRIS, JODI FERRIS, and A.F., a minor, by her parents,<br><div align="center">*Plaintiffs*</div><br>v.<br>MILTON S. HERSHEY MEDICAL CENTER; CAITLIN J. MALLIS, M.D.; IAN M. PAUL, M.D.; and COLIN MACNEILL, M.D., physicians; JANE DOE, R.N.; JANET DOE, R.N., registered nurses; JOHN ROE and JANE ROE, hospital staff members; JANET ROE and JACK ROE, risk management personnel, personally and in their official capacity; OFFICER RIAN BELL, Derry Township Police Officer, and ANGELICA LOPEZ-HEAGY, a social worker, in their individual capacity;<br><div align="center">*Defendants*</div> | NO. 1:12-cv-00442<br><br>(Hon. John E. Jones, III)<br><br><br>ELECTRONICALLY FILED |

## ORDER

AND NOW, this        day of                , 2012, upon consideration of the

Motion of Defendants Penn State Milton S. Hershey Medical Center, Ian M. Paul,

M.D., Caitlin J. Mallis, M.D., and Colin MacNeill, M.D., (collectively the "HMC

Defendants") to Dismiss, and any response thereto, it is hereby ORDERED that the

motion is GRANTED and Plaintiffs' First Amended Complaint against the HMC

Defendants is DISMISSED with prejudice.

<div align="right">

**BY THE COURT:**

_____
John E. Jones, III, Judge

</div>

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SCOTT FERRIS, JODI FERRIS, and A.F., a minor, by her parents,<br><br>*Plaintiffs*<br><br>v.<br><br>MILTON S. HERSHEY MEDICAL CENTER; CAITLIN J. MALLIS, M.D.; IAN M. PAUL, M.D.; and COLIN MACNEILL, M.D., physicians; JANE DOE, R.N.; JANET DOE, R.N., registered nurses; JOHN ROE and JANE ROE, hospital staff members; JANET ROE and JACK ROE, risk management personnel, personally and in their official capacity; OFFICER RIAN BELL, Derry Township Police Officer, and ANGELICA LOPEZ-HEAGY, a social worker, in their individual capacity;<br><br>*Defendants* | NO. 1:12-cv-00442<br><br><br>(Hon. John E. Jones, III)<br><br><br><br><br><br><br><br><br><br>ELECTRONICALLY FILED |

## MOTION OF DEFENDANTS
## PENN STATE MILTON S. HERSHEY MEDICAL CENTER; IAN M. PAUL, M.D.; CAITLIN J. MALLIS, M.D.; AND COLIN MACNEILL, M.D., TO DISMISS PURSUANT TO RULE 12(b)(6)

Defendants the Penn State Milton S. Hershey Medical Center, Ian M. Paul, M.D., Caitlin J. Mallis, M.D., and Colin MacNeill, M.D., (collectively the "HMC Defendants"); by and through their undersigned counsel, seek dismissal of Plaintiffs' First Amended Complaint pursuant to Rule of Civil Procedure 12(b)(6) and, in support thereof, state as follows:

**Factual Background:**

1.     Plaintiffs Scott and Jodi Ferris, individually and on behalf of their minor child, A.F., brought this action against the HMC Defendants, and unnamed nurses and staff; a Derry Township police officer; and a Dauphin County social worker, for the alleged events surrounding A.F.'s hospitalization after her birth outside of the hospital's emergency room.

2.     For purposes of this motion, the HMC Defendants accept, as they must, the allegations of Plaintiffs' First Amended Complaint as true. Dayhoff, Inc. v. H.J. Heinz Co., 86 F.3d 1287, 1301 (3d Cir. 1996).[1]

3.     The following statement of facts consists of Plaintiffs' factual allegations and matters of public record relating to the state's temporary removal of A.F. from her parents' custody.[2]

4.     According to Plaintiffs, A.F. was born in an ambulance outside the emergency room at about 7 a.m. on June 27, 2010.   Am'd. Compl., ¶¶ 22, 29 (Doc. 46) (Exhibit "A" hereto).

---

[1] While bound to accept as true Plaintiffs' factual allegations for purposes of this motion, the HMC Defendant note that the accuracy of Plaintiffs' key factual allegations is directly contradicted by the evidence ascertained to date.

[2] This Court may consider the public record when deciding this Motion to Dismiss as Plaintiffs' factual allegations are expressly linked to the dependency proceedings. See Lum v. Bank of Amer., 361 F.3d 217, 221 n.3 (3d Cir. 2004); see also Beddall v. State St. Bank and Trust Co., 137 F.3d 12, 17 (1st Cir. 1998). A.F.'s name has been redacted from the public records appended hereto. The original versions of the documents were previously filed under seal with the Dauphin County Social Services' Motion to Dismiss (Doc. 20).

9944462v.1

5.     Upon her arrival at the hospital, Mrs. Ferris was allegedly mistreated by hospital personnel, including the attempted administration of an injection, a refusal to answer her medical questions, and the provision of contradictory information regarding A.F.'s departure time. See Am'd. Compl., ¶¶ 30-76.

6.     At about mid-day, Mrs. Ferris was allegedly advised by Risk Management that the hospital was required to keep the baby 48-72 hours for observation, but hospital staff allegedly agreed to work with the Ferrises to have the baby discharged in 24 hours. Am'd. Compl., ¶¶ 73, 76.

7.     The hospital staff allegedly advised the Ferrises that could stay with the baby, but that their older children could not spend the night. Am'd. Compl., ¶¶ 76-84.

8.     The hospital allegedly placed a "guard" nurse in Mrs. Ferris's room to allegedly ensure that she would not leave with the baby. Am'd. Compl., ¶¶ 76-86.

9.     At some point in the afternoon, Mr. Ferris left to attend to the other children. Am'd. Compl., ¶ 110.

10.    During the early afternoon, a hospital staff member contacted the Dauphin County Social Services allegedly "with the intent and expectation of preventing Mrs. Ferris from leaving the hospital with A.F." Am'd. Compl., ¶ 87.

11.    According to Plaintiffs, "[o]nce the medical defendants contacted the social worker, it was reasonably foreseeable that the social worker would take steps that would lead to taking legal custody of A.F." Am'd. Compl., ¶ 89.

-3-

12.   At about 3:00 or 4:00 p.m., social worker Angelica Lopez-Heagy arrived to conduct an investigation regarding Plaintiffs' alleged refusal to provide medical treatment to A.F.  Am'd. Compl., ¶¶ 90-91.

13.   A discussion ensued between Mrs. Ferris and the social worker regarding the allegations against the Ferrises as to their failure to provide medical treatment.  Am'd. Compl., ¶¶ 92-101.

14.   The social worker allegedly threatened Mrs. Ferris that she would call the police to take custody of the baby if Mrs. Ferris did not cooperate with her. Am'd. Compl., ¶ 97.

15.   The social worker allegedly conferred with hospital staff while conducting her investigation.  Am'd. Compl., ¶¶ 105-07.

16.   The hospital staff had sought to treat the baby for Group B Strep and administer a Hepatitis B injection to her, but Mrs. Ferris refused consent and, despite some further discussion between the hospital staff and Mrs. Ferris regarding blood testing before the lab closed at 6:00 p.m., the procedures were not performed.  Am'd. Compl., ¶¶ 111-23.

17.   The hospital staff allegedly acknowledged that the medical procedures in question were standard procedure which Plaintiffs erroneously equate with "not medically necessary."  Am'd. Compl., ¶ 109.

18.   Mrs. Ferris told the social worker that she did not consent to the Hepatitis B shot due to her religious beliefs.  Am'd. Compl., ¶¶ 127-28.

-4-

19.     After Mrs. Ferris referred the social worker to Mr. Ferris (absent at the time) for further questions regarding their religious beliefs, the social worker allegedly threatened to call the police. Am'd. Compl., ¶ 128-29.

20.     The social worker allegedly acknowledged that this was an "unusual case" because "there is no neglect or abuse," but was required to have the Ferrises sign a voluntary safety plan under the circumstances. Am'd. Compl., ¶ 125.

21.     The social worker allegedly threatened Mrs. Ferris that she would call the police if she did not sign a voluntary safety plan. Am'd. Compl., ¶ 130.

22.     Approximately three hours after the social worker's arrival, and after further discussion with Mrs. Ferris regarding her unwillingness to agree to sign a plan without consulting her husband and a lawyer, the social worker called Officer Rian Bell. Am'd. Compl., ¶¶ 131-42.

23.     Officer Bell concluded that "there are reasonable grounds to believe the child is suffering from illness or injury, or is in imminent danger from her surroundings and removal is necessary," and took custody of A.F. Am'd. Compl., ¶ 144; Law Enforcement Custody Order (Exhibit "B" hereto).

24.     In the meantime, the social worker drew up the voluntary safety plan with the alleged participation of hospital staff who provided a treatment plan. Am'd. Compl., ¶¶ 139-41.

25.     After Officer Bell had taken custody of the baby, the social worker allegedly provided Mrs. Ferris with a copy of the plan. Am'd. Compl., ¶ 149.

-5-

26.     The social worker advised Mrs. Ferris that it was too late for her to sign the plan at that point. Am'd. Compl., ¶ 150.

27.     The police officer directed custody of A.F. to be turned over to the hospital. Am'd. Compl., ¶ 154.

28.     The social worker allegedly authorized the hospital to administer the Hepatitis B shot. Am'd. Compl., ¶ 158.

29.     Mrs. Ferris was advised that there would be a hearing the next morning. Am'd. Compl., ¶ 157.

30.     The police officer then allegedly escorted Mrs. Ferris off the premises and ran into Mr. Ferris, upon his return to the hospital, and also escorted him off the premises. Am'd. Compl., ¶¶ 159-61.

31.     The Ferrises allegedly spent the night across the road in their car. Am'd. Compl., ¶ 164.

32.     Plaintiffs allege that Mrs. Ferris was told that she would be permitted to return to the hospital every three hours to feed A.F., but that the hospital did not always provide her complete access. Am'd. Compl., ¶¶ 162-63.

33.     While A.F. was physically separated from her parents, she allegedly received "medical testing and procedures" by Dr. Paul without their consent, Am'd. Compl., ¶¶ 166-67, which allegedly caused her bruising on her heels and sensitivity to the touch below the knee, Am'd. Compl., ¶¶ 173-74.

34.     The public record shows that the next morning, June 28, 2010, the social worker filed a Dependency Petition in the Dauphin County Court of Common Pleas, seeking custody for lack of proper parental care, pursuant to 42 Pa. C.S. § 6302. See Dependency Petition (Exhibit "C" hereto).

35.     Plaintiffs allege that the Dependency Petition was drafted with the assistance of hospital staff, and allegedly contained false information regarding A.F.'s due date, and "other" unspecified misleading information. Am'd. Compl., ¶¶ 168-70.

36.     By order entered at 10:17 a.m. on June 28, 2010, the Court granted the Dependency Petition and directed that A.F. be placed in the custody of the Dauphin County Social Services pending a Juvenile Court hearing. See Court Order (Exhibit "D" hereto).

37.     A "shelter care" hearing took place later in the morning of June 28, 2010, within 24 hours of the removal of A.F., after which custody was returned to her parents. Am'd. Compl., 171.

38.     Although the Ferrises regained custody, they allowed A.F. to remain in the hospital for several more days. Am'd. Compl., ¶¶ 172, 175. During A.F.'s continued hospitalization, Plaintiffs complain that Dr. Paul and other unidentified medical personnel provided inadequate care to A.F. Am'd. Compl., ¶¶ 176-180, 185.

**Procedural History:**

39.    In their original Complaint, Plaintiffs asserted claims against HMC, Dr. Paul, and Dr. Mallis for:  (1) battery/lack of consent for medical procedures performed on A.F. (Third Cause of Action); (2) false imprisonment of A.F. (Fourth Cause of Action); (3) intentional infliction of emotional distress due to conduct directed toward A.F., (Fifth Cause of Action); and (4) a Fourth Amendment claim for unreasonable seizure of A.F. by Officer Bell (Second Cause of Action).  See Doc. 1.[3]

40.    Plaintiffs did not name Dr. MacNeill in their original complaint.

41.    Plaintiffs did not assert a Fourteenth Amendment claim against the HMC Defendants in their original complaint.

42.    The Court granted the HMC Defendants' Motion to Dismiss in its entirety, allowing Plaintiffs to file an Amended Complaint pertaining only to their constitutional claims.

43.    Plaintiffs have now filed their First Amended Complaint, naming Dr. MacNeill for the first time, and adding a new Fourteenth Amendment claim (First Cause of Action) in addition to repleading their Fourth Amendment claim (Second Cause of Action) against the HMC physicians.  See Doc. 46.

---

[3]Plaintiffs did not expressly plead a Fourth Amendment cause of action against the HMC Defendants in their original complaint but, after Plaintiffs raised the issue in response to the HMC Defendants' Motion to Dismiss, the Court construed the complaint as including a Fourth Amendment claim against them.  See Doc. 45 at 11.

-8-

44.     Plaintiffs have retained HMC as a named defendant in the caption but do not assert any claims against it.

45.     Plaintiffs' claims against the HMC Defendants pertain exclusively to the removal of A.F. from the Ferrises by Officer Bell.

**Reasons for Dismissal:**

46.     A Rule 12(b)(6) motion to dismiss should be granted when the well-plead factual allegations do not give rise to any plausible entitlement to relief. Santiago v. Warminster Twp., 2010 U.S. App. Lexis 25414, *13 (3d Cir. Dec. 14, 2010).

47.     Plaintiffs' conclusory statements regarding what the HMC Defendants allegedly intended, knew, or reasonably should have known regarding the decision of the social worker and/or police officer to take A.F. into protective custody, see, e.g., Am'd. Compl., ¶¶ 78, 87, 88, 89, 188, 189, are not entitled to the presumption of truth. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).

48.     At its core, Plaintiffs' counter-intuitive claim is that the HMC Defendants were not motivated by concern for the welfare of the newborn, but by a gratuitous conspiracy with social services and the police to falsely imprison A.F. to provide medical care to her which Plaintiffs acknowledge was "standard" medical procedure.

9944462v.1

49.    In essence, Plaintiffs are attempting to tie physicians on the front-line of pediatric care to a constitutional claim based on their performance of their statutorily-mandated duties.

**First Cause of Action**

50.    In their First Cause of Action, Plaintiffs allege that Officer Bell, Ms. Lopez-Heagy, Dr. Paul, Dr. Mallis, and Dr. MacNeill violated Plaintiffs' Fourteenth Amendment rights to procedural due process by depriving them of custody of A.F. without consent or court order.  Am'd. Compl., ¶¶ 191-92.

51.    Plaintiffs' newly-plead Fourteenth Amendment claim against the HMC Defendants, for events that occurred in June 2010, is time-barred by the two-year statute of limitations as against Mr. and Mrs. Ferris.  Mills v. City of Philadelphia, 2012 WL 2989683, *1 (3rd Cir. July 23, 2012) (applying Pennsylvania's two-year statute of limitations to procedural due process claim).

52.    Plaintiffs' newly-plead Fourteenth Amendment claim against Dr. MacNeill, for events that occurred in June 2010, is time-barred by the two-year statute of limitations as against Mr. and Mrs. Ferris.  Garvin v. City of Philadelphia, 354 F.3d 215, 220 (3rd Cir. 2003) ("The naming of a John Doe defendant in a complaint does not stop the statute of limitations from running or toll the limitations period as to that defendant.").

53.    HMC cannot be held vicariously liable for the alleged conduct of its physicians, nurses, and staff, and Plaintiffs do not plead any institutional policy,

custom, or practice that could subject HMC to liability.  See Monell v. Department of Social Services, 436 U.S. 658, 693 (1978); Eaton v. Univ. of Del., 2001 WL 863441, *5 (D. Del. 2001).

54.     Plaintiffs plead the single conclusory allegation that HMC is a "state institution and federal fund recipient," Am'd. Compl., ¶ 7, which is legally insufficient to establish that HMC is a state actor.  See Groman v. Twp. of Manalapan, 47 F.3d 628, 638-40 (3d Cir. 1995) (holding that a first-aid squad is not a state actor even though it received public funds, functioned to support the police, and responded to police calls to aid persons in police custody).

55.     Plaintiffs failed to adequately plead that any HMC physician is a state actor because, apart from conclusory new allegations regarding what the HMC Defendants knew or should have known, the only new factual allegations concern an alleged "guard" nurse allegedly intended to prevent Mrs. Ferris from leaving with A.F. before the social worker's arrival, the alleged cooperation with the social worker's investigation, the alleged provision of a desired medical treatment plan for inclusion in the voluntary safety plan, and the alleged provision of medical information for inclusion in the Dependency Petition after A.F. was taken into custody by Officer Bell.   These allegations neither expressly nor inferentially establish that the "HMC Defendants either themselves accomplished the seizure of A.F., knowingly initiated a constitutional deprivation, or conspired with others to

set in motion a course of action which they knew, or should have known, would result in a constitutional violation," Doc. 45 at 13.

56.     Plaintiffs failed to plead any procedural due process violation upon which relief can be granted because Plaintiffs do not allege any violation of the Pennsylvania statutory procedure regarding the taking of a newborn into protective custody or that the Pennsylvania statutory procedure violates due process.  See, e.g., Studli v. Children & Youth and Families Central Regional Office, 346 Fed. Appx. 804, *809, 813 (3rd Cir. 2009) (finding no violation of procedural due process where plaintiff did not allege any violation of Pennsylvania statutory procedure for taking child into protective custody or that the Pennsylvania statutes violate due process).

57.     Plaintiffs also failed to plead any procedural due process violation upon which relief can be granted because Plaintiffs do not, and cannot, allege how a different result would have been reached had the HMC Defendants, the social worker, and/or the police officer sought a court order before taking protective custody of A.F. when the Court of Common Pleas approved the temporary removal of A.F. from the Ferrises the following morning prior to the shelter care hearing. See, e.g., Brown v. Daniels, 290 Fed. Appx. 467, 473-74 (3rd Cir. 2008) (finding no injury due to alleged delay in hearing on protective custody in absence of proof that timely hearing would have prevented the alleged deprivation of familial rights); see Court Order (Exhibit "D" hereto).

-12-

58.    To the extent, if any, that Plaintiffs intend to sue Dr. Paul, Dr. Mallis, and Dr. MacNeill in their personal capacities, they are entitled to qualified immunity. See, e.g., Studli, 346 Fed. Appx. at 809, 813 (finding qualified immunity for taking child into protective custody pursuant to Pennsylvania statutory procedure in absence of allegations establishing violation of due process or that right allegedly violated was clearly established at time of defendant's conduct); see also Jarovits v. Monroe County Children and Youth Servs., 345 Fed. Appx. 784, 788-89 (3rd Cir. 2009) (finding qualified immunity for taking child into protective custody even where Pennsylvania statutory procedure not followed because due process right allegedly violated not clearly established).

**Second Cause of Action**

59.    In their Second Cause of Action, Plaintiffs allege that Officer Bell, Ms. Lopez-Heagy, Dr. Paul, Dr. Mallis, and Dr. MacNeill violated Plaintiffs' Fourth Amendment rights by seizing A.F. without a warrant, court order, or exigent circumstances. Am'd. Compl., ¶¶ 193-94.

60.    Plaintiffs' newly-plead Fourth Amendment claim against Dr. MacNeill, for events that occurred in June 2010, is time-barred by the two-year statute of limitations as against Mr. and Mrs. Ferris. Garvin, 354 F.3d at 220.

61.    HMC cannot be held vicariously liable for the alleged conduct of its physicians, nurses, and staff, and Plaintiffs do not plead any institutional policy,

custom, or practice that could subject HMC to liability.  See Monell, 436 U.S. at 693; Eaton, 2001 WL 863441, *5.

62.     Plaintiffs plead the single conclusory allegation that HMC is a "state institution and federal fund recipient," Am'd. Compl., ¶ 7, which is legally insufficient to establish that HMC is a state actor.  See Groman, 47 F.3d at 638-40.

63.     Plaintiffs failed to adequately plead that any HMC physician is a state actor because, apart from conclusory new allegations regarding what the HMC Defendants knew or should have known, the only new factual allegations concern an alleged "guard" nurse allegedly intended to prevent Mrs. Ferris from leaving with A.F. before the social worker's arrival, the alleged cooperation with the social worker's investigation, the alleged provision of a desired medical treatment plan for inclusion in the voluntary safety plan, and the alleged provision of medical information for inclusion in the Dependency Petition after A.F. was taken into custody by Officer Bell.   These allegations neither expressly nor inferentially establish that the "HMC Defendants either themselves accomplished the seizure of A.F., knowingly initiated a constitutional deprivation, or conspired with others to set in motion a course of action which they knew, or should have known, would result in a constitutional violation," Doc. 45 at 13.

64.     The HMC Defendants are entitled to absolute immunity to the extent that Plaintiffs' claims pertain to conduct integral to the preparation, initiation, and

prosecution of the Dependency Petition. <u>Briscoe v. LaHue</u>, 460 U.S. 325, 341 (1983); <u>Ernst v. Child and Youth Servs.</u>, 108 F.3d 486, 495 (3d Cir. 1997).

65. · To the extent, if any, that Plaintiffs intend to sue Dr. Paul, Dr. Mallis, and Dr. MacNeill in their personal capacities, they are entitled to qualified immunity because Plaintiffs failed to establish that any of the physicians violated Plaintiffs' Fourth Amendment rights and no reasonable physician under the circumstances should have understood that, when faced with Mrs. Ferris's uncooperativeness and refusal to provide routine medical care to her newborn infant, the summoning of a social worker would lead to a violation of Plaintiffs' Fourth Amendment rights. <u>See</u> <u>Dennis v. DeJong</u>, 2011 WL 4732810, *22 (E.D. Pa. Sept. 30, 2011).

WHEREFORE, Defendants Penn State Milton S. Hershey Medical Center; Ian M. Paul, M.D.; Caitlin J. Mallis, M.D., and Colin MacNeill, M.D., respectfully request this Honorable Court to grant this motion and dismiss Plaintiffs' First Amended Complaint against them with prejudice, consistent with the attached proposed order.

Respectfully submitted,

**WHITE AND WILLIAMS LLP**

 /s/ Thomas M. Goutman
Thomas M. Goutman (PA30236)
Kim Kocher (PA66557)
Christopher E. Ballod  (PA89462)
1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, PA  19103-7395
Phone:  215-864-6332
ballodc@whiteandwilliams.com

*Attorneys for Defendants*
*Penn State Milton S. Hershey*
*Medical Center; Ian M. Paul,*
*M.D.; Caitlin J. Mallis, M.D.; and*
*Colin MacNeill, M.D.*

Dated:  September 26, 2012

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SCOTT FERRIS, JODI FERRIS, and A.F., a minor, by her parents, | : NO. 1:12-cv-00442 |
| *Plaintiffs* | : |
| v. | : |
| MILTON S. HERSHEY MEDICAL CENTER; CAITLIN J. MALLIS, M.D.; IAN M. PAUL, M.D.; and COLIN MACNEILL, M.D., physicians; JANE DOE, R.N.; JANET DOE, R.N., registered nurses; JOHN ROE and JANE ROE, hospital staff members; JANET ROE and JACK ROE, risk management personnel, personally and in their official capacity; OFFICER RIAN BELL, Derry Township Police Officer, and ANGELICA LOPEZ-HEAGY, a social worker, in their individual capacity; | : (Hon. John E. Jones, III) |
| *Defendants* | : |
| | : ELECTRONICALLY FILED |
| | : |

## CERTIFICATE OF NON-CONCURRENCE

I hereby certify that concurrence in the HMC Defendants' Motion to Dismiss was sought from Plaintiffs' Counsel, Matthew D. Menges, Esquire, and that Plaintiffs do not concur in the motion.

WHITE AND WILLIAMS LLP

 /s/ Kim Kocher
Kim Kocher (PA66557)

*Attorneys for Defendants*
*Penn State Milton S. Hershey Medical Center; Ian M. Paul, M.D.; Caitlin J. Mallis, M.D.; and Colin MacNeill, M.D.*

Dated:  September 26, 2012

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| SCOTT FERRIS, JODI FERRIS, and A.F., a minor, by her parents, | :    NO. 1:12-cv-00442 |
| *Plaintiffs* | : |
| v. | : |
| MILTON S. HERSHEY MEDICAL CENTER; CAITLIN J. MALLIS, M.D.; IAN M. PAUL, M.D.; and COLIN MACNEILL, M.D., physicians; JANE DOE, R.N.; JANET DOE, R.N., registered nurses; JOHN ROE and JANE ROE, hospital staff members; JANET ROE and JACK ROE, risk management personnel, personally and in their official capacity; OFFICER RIAN BELL, Derry Township Police Officer, and ANGELICA LOPEZ-HEAGY, a social worker, in their individual capacity; | :    (Hon. John E. Jones, III) |
| *Defendants* | : |
| | :    ELECTRONICALLY FILED |
| | : |

## <u>CERTIFICATE OF SERVICE</u>

I, Kim Kocher, hereby certify that a true and correct copy of the foregoing

Motion of Defendants Penn State Milton S. Hershey Medical Center; Ian M. Paul,

M.D.; Caitlin J. Mallis, M.D.; and Colin MacNeill, M.D., to Dismiss was served on

this 26th day of September, 2012, by the United States District Court for the Middle

District of Pennsylvania electronic case filing system and U.S. First Claim Mail,

postage prepaid, upon the following:

Matthew D. Menges, Esquire
Joshua B. Bodene, Esquire
**MENGES & MCLAUGHLIN, P.C.**
145 East Market Street
York, PA 17401
*Attorney for Plaintiffs*

Thomas Geroulo, Esquire
Wendi D. Barish, Esquire
**WEBER GALLAGHER SIMPSON
   STAPLETON FIRES & NEWBY LLP**
2000 Market Street, 13th Floor
Philadelphia, PA 19103
*Attorneys for Defendant Officer Rian Bell*

Donald L. Carmelite, Esquire
**MARSHALL DENNEHEY WARNER COLEMAN
   & GOGGIN**
4200 Crums Mill Road, Suite B
Harrisburg, PA 17112
*Attorneys for Defendant Angelica Lopez-Heagy*

John P. Gonzales, Esquire
**MARSHALL DENNEHEY WARNER COLEMAN
   & GOGGIN**
1845 Walnut Street
Philadelphia, PA 191003
*Attorneys for Defendant Angelica Lopez-Heagy*

                                       **WHITE AND WILLIAMS LLP**


                                        /s/ Kim Kocher
                                       _____
                                       Kim Kocher (PA66557)

                                       *Attorneys for Defendants
                                       Penn State Milton S. Hershey Medical
                                       Center; Ian M. Paul, M.D.;
                                       Caitlin J. Mallis, M.D.; and Colin MacNeill,*
Dated:  September 26, 2012             *M.D.*

# EXHIBIT A

## IN THE FEDERAL DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SCOTT FERRIS, JODI FERRIS, and A.F., a minor, by her parents, | CIVIL ACTION: NO. 1:12-cv-00442 |
| *Plaintiffs* | Hon. John E. Jones III |
| v. | **FIRST AMENDED COMPLAINT** |
| MILTON S. HERSHEY MEDICAL CENTER; CAITLIN J. MALLIS, M.D., IAN M. PAUL, M.D., and COLIN MACNEILL, M.D., physicians; JANE DOE, R.N., JANET DOE, R.N., registered nurses; JOHN ROE and JANE ROE, hospital staff members; JANET ROE and JACK ROE, risk management personnel, personally and in their official capacity; OFFICER RIAN BELL, Derry Township Police Officer, and ANGELICA LOPEZ-HEAGY, a social worker, in their individual capacity; | **JURY TRIAL DEMANDED** |
| *Defendants* | |

## FIRST AMENDED COMPLAINT

## INTRODUCTION

This is a civil action commenced pursuant to 42 U.S.C. § 1983 to redress the

deprivation by the Defendants of rights secured to Plaintiffs under the Fourteenth

Amendment to the United States Constitution which occurred when the Defendants

took custody of the Plaintiffs' daughter A.F. without lawful authority.

Because of the illegal and unconstitutional actions of the Hershey S. Milton

Medical Center, its physicians, nurses, and staff, and social worker Angelica

Lopez-Heagy, Plaintiffs Scott and Jodi Ferris's daughter, A.F., was removed from

their custody for the first few days of her life.  In fact, the Ferrises were forced to

spend the first night of her life huddled up in their car in the parking lot across the

street from the hospital, all because the hospital would not answer her parents'

questions about A.F.'s medical treatment.

### JURISDICTION AND VENUE

1.  The Plaintiffs, Scott and Jodi Ferris, individually and as parents and next

friends of A.F., born 2010, who reside in Dauphin County at a confidential address

with a mailing address of P.O. Box 2465 #198, Harrisburg PA 17105, bring this

civil rights lawsuit pursuant to 42 U.S.C. § 1983 to redress the deprivation by the

Defendants under color of state law of rights secured to them under the Fourteenth

Amendment to the United States Constitution.

2.  Jurisdiction over the first and second causes of action is conferred on this

court by 28 U.S.C. § 1343(3) and 1343(4), which provides for original jurisdiction

in this court over all suits brought pursuant to 42 U.S.C. § 1983. Jurisdiction is also

conferred on this court by 28 U.S.C. § 1331(a) because the cause of action arises

under the Constitution and laws of the United States.

First Amended Complaint                   2

3. Jurisdiction over the third cause of action is conferred on this court by 28 U.S.C. § 1367(a), which provides this court with supplemental jurisdiction over all claims which are so related to the claims in the first and second causes of action that they form part of the same case or controversy under Article III of the United States Constitution.  Supplemental jurisdiction over this claim is appropriate because the claims stated in the third cause of action arise from the same nucleus of operative facts as the claims over which this court has original jurisdiction.

4. Venue properly lies in this Court pursuant to 28 U.S.C. § 1391 in that all of the parties reside in this federal district.

## PARTIES

5. Scott and Jodi Ferris are citizens of the United States who reside in Williamstown, Pennsylvania.

6. Scott and Jodi Ferris are the parents of A.F.

7. Defendant Milton S. Hershey Medical Center is a state institution and federal fund recipient with an address of 500 University Drive, Hershey, Dauphin County, Pennsylvania, 17033.

8. Upon information and belief, Defendant Caitlin J. Mallis, M.D., was at all pertinent times herein an employee of Defendant Hershey Medical Center and

First Amended Complaint                3

was at all pertinent times herein on or about its business in the course and scope of her employment.

9.   Upon information and belief, Defendant Ian M. Paul, M.D., is an employee of Defendant Hershey Medical Center and was at all pertinent times herein on or about its business in the course and scope of his employment.

10. Upon information and belief, Defendant Colin MacNeill, M.D., is an employee of Defendant Hershey Medical Center and was at all pertinent times herein on or about its business in the course and scope of his employment.

11.  Upon information and belief, Defendant Nurse Jane Doe is an employee of Defendant Hershey Medical Center and was at all pertinent times herein on or about its business in the course and scope of her employment.

12.  Upon information and belief, Defendant Nurse Janet Doe is an employee of Defendant Hershey Medical Center and was at all pertinent times herein on or about its business in the course and scope of her employment.

13.  Upon information and belief, Defendant Hospital Staff John Roe is an employee of Defendant Hershey Medical Center and was at all pertinent times herein on or about its business in the course and scope of his employment.

14.  Upon information and belief, Defendant Hospital Staff Jane Roe is an employee of Defendant Hershey Medical Center and was at all pertinent times herein on or about its business in the course and scope of her employment.

First Amended Complaint                    4

15. Upon information and belief, Defendant Risk Management Personnel Jack Roe is an employee of Defendant Hershey Medical Center and was at all pertinent times herein on or about its business in the course and scope of his employment.

16. Upon information and belief, Defendant Officer Rian Bell is an employee of the Derry Township Police Department and was at all pertinent times herein on or about its business in the course and scope of his employment

17. Upon information and belief, Defendant Social Worker Angelica Lopez-Heagy is an employee of Defendant Dauphin County Social Services for Children and Youth and was at all pertinent times herein on or about its business in the course and scope of her employment.

## FACTS

18. On Monday, June 21, 2010, Jodi Ferris was almost nine months pregnant.

19. Jodi and her husband Scott went to a prenatal appointment with Certified Professional Midwife Dhyana Heller.

20. Although Scott and Jodi wanted to use Heller as their midwife to attend the birth, they needed some extra time to make financial arrangements.

21. Heller offered to consult by phone if they were unable to find another midwife and if Jodi went into labor at home.

First Amended Complaint                    5

22. By 7:00 a.m. on Sunday, June 27, Jodi's labor contractions had intensified to the point that she asked Scott to call Midwife Heller.

23. Heller told Scott that based on Jodi's condition, it appeared to her that she might not be able to get to the Ferris' house before the birth.

24. Heller discussed options with the Ferrises, including whether to drive to the hospital, call an ambulance, or have an unattended birth at home.

25. Heller encouraged Scott and Jodi to make the decision quickly for themselves.

26. There are four hospitals in the area, all about one hour from the Ferrises' house: Penn State Hershey Medical Center; PinnacleHealth – Harrisburg Pennsylvania Hospital & Healthcare System; Sunbury Community Hospital; and Schuylkill Medical Center – South Jackson Street

27. Jodi called 911 and asked for an ambulance to be sent.

28. The ambulance took Jodi to Hershey Medical Center.

29. Just after the ambulance stopped at the emergency room door of Hershey Medical Center, Jodi's daughter A.F. was born in the ambulance.

30. While Jodi and A.F. were being transported by stretcher into the hospital, Jodi kept asking questions as to how the baby was doing.

31. There were at least six hospital staff persons surrounding Jodi.

32. The hospital staff never answered Jodi's questions.

First Amended Complaint                    6

33. Dr. Colin MacNeill came into the room and obtained some basic medical history from Jodi.

34. Dr. Colin MacNeill expressed hostility toward using midwives and/or home deliveries.

35. Defendant Nurse Jane Doe approached Jodi with a hypodermic needle.

36. When Jodi asked her what the needle was, Nurse Jane Doe said, "It's just a shot."

37. Jodi again asked her what the shot was, and Nurse Jane Doe said, "It's just to help."

38. Jodi asked a third time what the shot was, and Nurse Jane Doe said, "It's for the placenta."

39. Jodi asked a fourth time what the shot was, and Nurse Jane Doe stuck the needle in Jodi's left arm and injected her.

40. Only then did Nurse Jane Doe say, "Oh, it's just oxytocin."

41. After Nurse Jane Doe had injected the medication needle in Jodi's arm, another staff person asked Jodi, "You aren't allergic to that, are you?"

42. Jodi again tried to obtain information on her daughter's condition, but no one would answer her questions.

43. Defendant Nurse Jane Doe and another nurse then grabbed Jodi's left arm and started to insert an IV.

First Amended Complaint                    7

44. Jodi asked, "Why do I need an IV?"

45. Defendant Nurse Jane Doe stated, "You don't. Now hold still so I can get this in you."

46. Jodi removed her arm from their grasp and informed the nurses that she did not want an IV if she did not need it.

47. Defendant Nurse Jane Doe ignored Jodi and grabbed her arm again.

48. Jodi again asked why she needed an IV.

49. Defendant Nurse Jane Doe stated, "Just in case."

50. Jodi asked, "In case of what?"

51. Jane Doe stated, "In case you need surgery."

52. Jodi asked why she would need surgery.

53. Jane Doe stated, "You don't need surgery. Now give me your arm."

54. Defendant Nurse Jane Doe stated that Jodi had to have the IV inserted "because hospital policy requires it, regardless of the patient's wishes."

55. Jane Doe repeatedly told Jodi they had no reason at all to expect that she would need an IV, but insisted they had to follow hospital policy, regardless of her wishes.

56. Jodi told both Jane Doe and the other attending nurse, "I told you no. I don't want an IV unless I need one."

First Amended Complaint                    8

57. Jodi asked what the baby's APGAR scores were, but no one would tell her.

58. Defendant Hospital staff John Roe took the baby out of the room.

59. When Jodi asked where the baby was being taken, John Roe would not tell her, instead saying, "She's in good hands. You'll be able to see her soon."

60. Defendant Nurse Janet Roe told Jodi that the baby should be ready to go home soon.

61. Defendant Doctor Caitlin Mallis told Jodi at 10:30 a.m. that the baby was doing really well and that the nurses would bring the baby to her soon.

62. Dr. Mallis said that the baby's APGAR score right then would be "9."

63. Defendant Doctor Colin MacNeill then told Jodi that the baby was "very sick" and would have to stay in the hospital.

64. Dr. MacNeill again expressed hostility toward midwives and said, "Too many people think they know what they're doing."

65. When the hospital staff brought the baby to Jodi at 11:40 a.m., Defendant Hospital Staff Member Jane Roe said, "The baby is doing good. She will be able to go home in no time."

66. Several hours later, however, Defendant Hospital Staff Member John Roe told them that the baby was going to have to stay in the hospital for 48-72 hours for observation.

First Amended Complaint                 9

67. John Roe would not answer Scott and Jodi's questions as to why the baby needed to stay.

68. John Roe told Jodi that the baby was fine and healthy.

69. John Roe told Jodi that "the law requires us to keep the baby for 48 hours."

70. When Jodi asked for the statute requiring this, John Roe told Jodi, "You'll have to get that from Risk Management."

71. John Roe told Jodi that "Risk Management wants the baby to stay admitted."

72. Defendant Risk Management Member Janet Roe told Jodi, "The baby is healthy and I do not anticipate any health problems with her over the next 48-72 hours, and so the baby cannot be discharged because we need to keep her for observation, as it is unsafe for her to leave the hospital."

73. Defendant Risk Management Member Jack Roe told Jodi it was "Risk Management policy" to keep "babies like this" for 48 to 72 hours.

74. Jack Roe never explained what he meant by "babies like this."

75. Jack Roe said that the Risk Management policy was not about managing the risk of medically at risk patients, but managing the risks that the hospital might get sued if they discharged a healthy baby where something goes wrong after discharge.

First Amended Complaint                    10

76. The hospital staff, upon request, provided Scott and Jodi with its policy for discharge after 24 hours and agreed to work with them to get the baby discharged in 24 hours, told the Ferrises that they would be moved to a new room in the nursery area, and that Scott and Jodi could stay with the baby throughout the night.

77. From this point on, the hospital had a nurse in Jodi's room continually.

78. Upon information and belief, the nurse was present to ensure that neither Jodi nor A.F. could leave the hospital room.

79. At one point the "guard" nurse wanted to use the restroom, so another nurse came to take her place.

80. Jodi asked if they would please post their "guard" nurse out in the hallway so the family could have some privacy regarding their discussions with Risk Management over whether they could take A.F. home within 24 hours.

81. The "guard" nurse asked another nurse about waiting outside the door. After a few seconds, the stand-in nurse was stationed in the hallway directly outside the door.

82. When Jodi opened the room door to ask hospital staff about the procedures for the 24-hour stay in the nursery, including if the older children could stay with the family, the "guard" nurse physically blocked her from exiting the room, even though Scott had the baby inside the room at the time.  Jodi was

First Amended Complaint                    11

physically stopped from entering the hallway, and had to ask her question from the doorway.

83. These "guard" nurses would not answer Scott's or Jodi's questions about A.F.'s treatment in the nursery.

84. The hospital staff eventually told Jodi that older children were not allowed to stay the night in the nursery, then demanded Jodi retreat from the doorway back into the room stating she wasn't "allowed" to be out of the room.

85. The "guard" nurses refused to let Jodi leave the room, even if A.F. stayed with Scott, despite Jodi's desire to leave and get her older children food.

86. After Jodi's continued discussion with Risk Management, it was obvious to Scott and Jodi that the hospital staff did not intend to honor their agreement to discharge A.F. within 24 hours, although no Defendant could give Jodi a medically-necessary reason to keep her in the hospital.

87. Upon information and belief, a defendant at Hershey Medical Center contacted Dauphin County Social Services with the intent and expectation of preventing Jodi from leaving the hospital with A.F.

88. Upon information and belief, the medical defendants also intended or reasonably knew that the social worker would either persuade Jodi to comply with their demands for treating A.F., whether or not medically necessary, or would take custody of the child from Jodi and Scott.

First Amended Complaint                    12

89. Once the medical defendants contacted the social worker, it was reasonably foreseeable that the social worker would take steps that would lead to taking legal custody of A.F. from Scott and Jodi.

90. Between 3:00 and 4:00 P.M., Defendant social worker Angelica Lopez-Heagy came into Jodi's room.

91. The social worker told Jodi that she was there to conduct an investigation.

92. Jodi asked to see the social worker's I.D. badge and a copy of the allegations.

93. Defendant social worker told Jodi that she could not tell her what the allegations were until her investigation was complete.

94. Jodi insisted that she wanted to see a copy of the allegations.

95. Defendant social worker told Jodi that she did not have a copy of the allegations, and that even if she did, it would be "against the law for me to show them to you."

96. Jodi told the social worker that she was not comfortable speaking with the social worker if she did not know the allegations.

97. The social worker told Jodi, "Since you're not going to cooperate, I'll just go and call the police and we can take custody of the baby."

98. Jodi informed the social worker that she was willing to cooperate.

First Amended Complaint                    13

99. The social worker then gave a vague description of allegations that Jodi was "refusing to provide medical treatment."

100.   The social worker did not specify which "medical treatment" Jodi had refused to provide.

101.   The social worker claimed that Jodi had refused to allow a vitamin K shot to be administered to her daughter.

102.   Jodi had never been asked about a vitamin K shot.

103.   Jodi had heard hospital staff in the ER talking about already having administered a vitamin K shot to A.F.

104.   After the social worker arrived, hospital staff continued to have a presence in the room.

105.   The social worker and the hospital nurses and risk management personnel took turns questioning Jodi.

106.   Several times, after Jodi answered the social worker's or hospital staff's questions, the social worker and hospital staff would go out of the room to "talk."

107.   Upon information and belief, the social worker and hospital staff were discussing the perceived need to take custody of A.F.

First Amended Complaint                 14

108.   Neither the social worker nor the hospital staff gave specific examples of medically-necessary treatment that Scott and Jodi refused.

109.   None of the procedures that were discussed by the social worker and medical staff with Jodi required emergency seizure of the child for medical reasons. The hospital intermittently acknowledged that the medical procedures they were demanding were "standard procedure" and not medically necessary.

110.   Scott reluctantly left the hospital to feed and care for the older children, and leave them with relatives.

111.   The hospital staff agreed to test the baby for Group B Strep before the lab closed at 6:00 P.M before administering treatment for GBS to A.F.

112.   The hospital staff told Jodi that they would not release the baby for 72 hours because "her GBS status is unknown."

113.   A few minutes later, the hospital staff claimed that the lab was going to close in a few minutes, and that they could have done the test earlier in the day, but hadn't thought of it.

114.   Defendant Doctor Caitlin Mallis stated that she would still agree to discharge in 24 hours if Jodi would allow the hospital to check the baby's white blood cell count.

115.   Jodi agreed to this check.

First Amended Complaint                    15

116.   The hospital staff claimed just before 6:00 p.m. that they needed to give the baby a shot for Hepatitis B.

117.   Jodi declined the HepB shot. Hospital staff insisted the shot must be given because it was "standard procedure" but acknowledged there was no medical reason for the shot unless Jodi had Hepatitis B.  The hospital staff stated they did not want to be "sued" if Jodi had lied to them about being Hepatitis B negative.

118.   Jodi affirmed she was negative for Hepatitis B, offered to sign a release, and offered to allow the hospital to test her for Hepatitis B.

119.   However, the hospital staff agreed to take a blood sample from Jodi to test for Hepatitis B.

120.   The hospital staff then refused to take a sample from Jodi, claiming that she had already checked out of the hospital.

121.   Jodi offered to have the test done at another hospital that evening.

122.   The social worker then stated that if Jodi left the hospital, she would consider that to be abandonment and call the police to take custody.

123.   No blood sample was ever actually taken from Jodi by the hospital staff.

124.   The social worker and hospital staff conferred in the hallway.

125.   The social worker came back into the room and stated that this was an unusual case because "there is no neglect or abuse," but that she still had to

investigate and had to have Scott and Jodi sign a safety plan because of the call made to their office.

126.    The social worker asked Jodi if there were any religious beliefs that were influencing her decision to refuse necessary medical treatment for her daughter.

127.    Jodi denied that she had refused medical treatment, except for the HepB shot, which was not necessary unless Jodi tested positive.

128.    Jodi explained that their decision not to have the HepB shot was a religiously motivated decision. The social worker began questioning Jodi about her religious beliefs.  Jodi (who by this point was physically exhausted from not having eaten or slept since the birth) asked that the social worker direct her religious questions to Scott when he returned.

129.    The social worker said that if Jodi would not talk to her, she would call the police and have them take custody of the baby.

130.    The social worker stated that she was going to require Jodi to sign a safety treatment plan agreeing to everything that the hospital staff was going to do to the baby, and if Jodi did not sign it, she would call the police to have them take custody of the baby. .  She demanded to know if Jodi would agree to sign the safety plan.

131.    Jodi asked to see a copy of the safety plan.

First Amended Complaint                    17

132.   The social worker stated "they" had not written the safety plan yet.

133.   Jodi stated that she could not agree to sign or not sign a safety plan she had not read. Jodi said she would not be comfortable signing anything if she didn't understand the potential legal implications without talking to an attorney first.

134.   The social worker said that the hospital staff was working on a list of procedures they wanted done. When Jodi asked what the procedures were, the social worker said Jodi would be required to consent to "whatever the hospital wanted" and that if Jodi did not sign it she would call the police and have them take custody of the baby.

135.   Jodi stated she would not agree to sign any plan consenting to procedures without knowing what the procedures were.

136.   Jodi then asked if she could at least wait until her husband returned later that evening to review the safety plan.

137.   The social worker said, "No, I've been here three hours working on this case, and I'm not waiting any longer. If he's back by the time we get it written up, I'll let him read it, otherwise, if you don't sign the safety plan, I'm calling the police and having them take custody of the baby."

138.   The social worker then left the room.

First Amended Complaint                    18

139.   Upon information and belief, the social worker followed through with her plan to collaborate with the hospital staff to write up a list of the hospital's desired treatment plan.

140.   Upon information and belief, the staff of Hershey Medical Center participated in development of the safety plan.

141.   Upon information and belief, the hospital staff and the social worker were cooperating with each other at this point.

142.   Upon information and belief, the social worker contacted Officer Rian Bell, a law enforcement officer with the Derry Township Police Department.

143.   Upon information and belief, the social worker asked Officer Bell to take emergency custody of A.F., without prior judicial authorization.

144.   Upon information and belief, based on the allegations of the social worker, Officer Bell concluded that "there are reasonable grounds to believe the child [A.F.] is suffering from illness or injury, or is in imminent danger from her surroundings, and that her removal is necessary."

145.   Upon information and belief, Officer Bell then released emergency custody of A.F. to Defendant Lopez for further placement.

146.   Upon information and belief, neither Officer Bell nor Defendant social worker received prior judicial approval before taking custody of A.F.

First Amended Complaint                    19

147.   Defendant social worker then returned to the room with Officer Bell, Officer Clements, and several hospital staff.

148.   The social worker said that she was taking custody of A.F. because Jodi would not sign the safety plan.

149.   Jodi told the social worker she had never seen a copy of the safety plan, and that she needed to see it before signing it. Only after the police had been summoned and custody had been removed, did the social worker provide a copy of the safety plan to Jodi.

150.   When Jodi asked for a pen to sign it, the social worker said, "That window has closed."

151.   Jodi pleaded with the officers not to take the baby.

152.   The officers told her there was nothing they could do.

153.   The social worker said she wasn't going to wait any longer.

154.   The officers told Jodi to give A.F. to the nurse, who was present in the hospital room.

155.   Defendant Nurse Janet Doe removed A.F. from Jodi's arms.

156.   The nurse and all other hospital staff in the room left with A.F., but the social worker and police officers remained.

First Amended Complaint             20

157.   The social worker told Jodi that there would be a hearing the next morning to determine whether they would get A.F. back. The social worker then left the room.

158.   Upon information and belief, the social worker then authorized the hospital to administer the HepB shot, even though the blood test that the hospital staff had agreed to do first was not done.

159.   The police escorted Jodi off the premises of the hospital.

160.   The police and Jodi met Scott coming into the hospital entrance, loaded down with blankets and pillows because he was still under the belief they were following the 24-hour discharge policy, and was planning to spend the night in the hospital.

161.   The police escorted Scott and Jodi off the premises of the hospital.

162.   Jodi was told that she would be allowed to come back to the hospital every three hours during the night to feed the baby, but Dr. Paul wrote a medical order for A.F. to be fed formula, and the hospital staff did not always allow Jodi access to A.F. every three hours.

163.   After 30 minutes of feeding, hospital security escorted Jodi off the hospital grounds, even if A.F. had not eaten or finished nursing.

164.   Jodi and Scott spent the night sleeping across the road in their car in a parking lot.

First Amended Complaint                    21

165.   The security officer who escorted them off the premises after the 8:00 a.m. feeding told them that they were not the first family he had seen that the hospital had treated this way.

166.   While separated from her parents, A.F. received medical testing and procedures from Defendant Doctor Ian M. Paul.

167.   Scott and Jodi did not consent to Dr. Paul's treatment of A.F.

168.   The defendant social worker filed a Dependency Petition with the Court of Common Pleas of Dauphin County the next morning, June 28, 2010.

169.   Upon information and belief, the medical defendants assisted the defendant social worker in drafting the petition.

170.   The petition contained false information regarding A.F.'s due date, and other misleading and/or false information.

171.   At the court shelter care hearing at 11 a.m., approximately one hour later, physical custody was immediately returned to the parents.

172.   When Scott and Jodi returned to the hospital to recover A.F., they were sent to a room by themselves for the majority of the visit.

173.   When Scott and Jodi finally had a chance to observe A.F., her heels were severely bruised from many needle injections.

174.   For the first month of her life, A.F. would flinch and cry whenever she was touched below the knee.

First Amended Complaint                    22

175.   Several days later, just before discharge, Scott and Jodi observed that A.F. had jaundice.

176.   Scott and Jodi mentioned to Defendant Doctor Paul that A.F. had jaundice.

177.   Dr. Paul told Scott and Jodi that he had not treated A.F. for jaundice.

178.   Dr. Paul told Scott and Jodi that he had spoken with the Ferris's pediatrician, Dr. Blutstein, who had repeatedly asked that Hershey Medical Center treat A.F. for jaundice.

179.   Dr. Paul told Scott and Jodi that he had refused to treat A.F. for jaundice, contrary to the request of Dr. Blutstein.

180.   Prior to being discharged from the hospital, A.F. received no treatment for jaundice from Dr. Paul, or from any other pediatrician employed by Defendant Hershey Medical Center.

181.   After being discharged from the hospital, A.F. had a pediatrician appointment with Dr. Blutstein.

182.   Dr. Blutstein diagnosed A.F. with jaundice.

183.   Because A.F.'s jaundice levels were too high and had been rising too quickly, Dr. Blutstone conducted numerous blood draws and blood tests on A.F.

184.   A.F.'s jaundice was so severe that A.F. had to be admitted to
PinnacleHealth Harrisburg Hospital two days after discharge for further medical
treatment.

185.   Upon information and belief, almost none of the procedures that
hospital staff had described as "medically necessary" were actually performed.

186.   At the dependency adjudication July 7, 2010, the case was dismissed.

187.   The court returned full physical and legal custody to Jodi and Scott
Ferris.

188.   Upon information and belief, by calling the social worker to
investigate without emergency medical justification, the hospital defendants set in
motion a course of action which they knew or reasonably should have known
would result in the violation of the Ferrises' constitutional rights.

189.   Upon information and belief, by cooperating with the social worker in
removing A.F. from her parents' custody without emergency medical justification,
the hospital defendants were joint participants with the social worker in violating
the Ferrises' constitutional rights.

## FIRST CAUSE OF ACTION

190.   The allegations contained in paragraphs 1 through 189 are hereby
realleged and incorporated by reference herein.

First Amended Complaint                    24

191.   The removal of A.F. from her parents' custody was a violation of Plaintiffs' Fourteenth Amendment right to procedural due process in that there was no emergency circumstance to justify deprivation of custody without parental consent or a court order.

192.   Defendants Officer Rian Bell, Angelica Lopez-Heagy, and Defendants Ian Paul, Caitlin Mallis, Colin MacNeill, and all Doe and Roe medical defendants violated clearly established statutory or constitutional rights of which a reasonable person in their position should have known.

## SECOND CAUSE OF ACTION

193.   The allegations contained in paragraphs 1 through 189 are hereby realleged and incorporated by reference herein.

194.   The coerced seizure of A.F. by Defendants Officer Bell and Angelica Lopez-Heagy acting in concert with Defendants Mallis, Paul, MacNeill, and all Roe and Doe medical defendants without a warrant, court order, or evidence of exigent circumstances was a violation of the Plaintiffs' Fourth Amendment right to be secure in their person against unreasonable seizures.

## THIRD CAUSE OF ACTION

195.   The allegations contained in paragraphs 1 through 189 are hereby realleged and incorporated by reference herein.

First Amended Complaint                    25

196.   Angelica Lopez-Heagy violated Pennsylvania common law by falsely imprisoning A.F. by unlawfully detaining her without the consent and over the objection of A.F.'s parents, Scott and Jodi Ferris.

## DAMAGES

197.   Plaintiffs allege that as a result of the violations of their civil rights described above each has suffered and will continue to suffer for an as yet undetermined length of time the following:

a.  Severe emotional distress;

b.  Emotional Distress; and

c.  Loss of enjoyment of life.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that this court:

1) Find that the defendants intentionally and illegally violated the Plaintiffs' constitutional rights;

2) Award compensatory damages in favor of the Plaintiffs, including A.F.;

3) Award punitive damages for Defendant's conduct in willful and wanton disregard for the rights of the Plaintiffs;

4) Award Plaintiffs costs and attorney's fees pursuant to 42 U.S.C. § 1988; and

5) Grant the Plaintiffs such other relief as may be deemed just and proper.

First Amended Complaint                    26

Dated this 11th day of September, 2012.

Respectfully submitted,

Scott Ferris
Jodi Ferris
*Plaintiffs*


/s/ Matthew D. Menges
**Matthew D. Menges, Esq.,
PA208132**
**Joshua B. Bodene, Esq.,
PA201513**
Menges & McLaughlin, P.C.
145 East Market Street
York, PA 17401
Phone: 717-843-8046
Fax: 717-854-4362

Michael P. Farris, Esq.
James R. Mason, III, Esq.
Darren A. Jones, Esq.
Home School Legal Defense Association
One Patrick Henry Circle
Purcellville, VA 20132
Phone: 540-338-5600
Fax: 540-338-1952
*Admitted pro hac vice*


First Amended Complaint                    27

# EXHIBIT B

RE: _____   _6/27/10_____
    (Print Child's Name; DOB / Age)
    _cTra~_

_____

_____

_____

_____  )

Parent / Caretaker's Name: _Jodi Ferris_____

Address: _211 Tunnel Street_____ Phone: _720-220-4021_
         _williamstown PA 17098_

For the reasons checked below, I, the undersigned, a law enforcement officer / duly authorized

officer of the Court, have taken the child(ren) listed above into custody pursuant to 42 PA. C.S.

§ 6324 and released him / her / them to Dauphin County Social Services for Children and Youth

for placement pursuant to 42 PA. C.S. § 6301 et seq.

____✓____   There are reasonable grounds to believe the child(ren) is / are
            suffering from illness or injury or are in imminent danger from his / her
            / their surroundings, and that his / her / their removal is necessary.

_____   There are reasonable grounds to believe that the child(ren) has have
            run away from his / her / their parents, guardian, or other custodian.

Date: _0-27-10_____   Name: _OFC. RIAN Ball_____

                         Signature: _____  (064)

                         Department: _Dolry Twp Police._

                              )

REV 04/05

# EXHIBIT C

Case 1:12-cv-00442-JEJ   Document 20-3   Filed 05/18/12   Page 1 of 9

**DEPENDENCY PETITION**



Commonwealth of Pennsylvania
Court of Common Pleas — Juvenile Division
County of Dauphin
12th Judicial District

In the Interest Of:

, a Minor

Docket No: CP-22-DP- _86_ -2010
FID: _22-FN- 50_ -2010

| PETITIONER / AGENCY | | |
|---|---|---|
| Name: Dauphin County Children and Youth | Address:   25 S. Front Street<br>Harrisburg, PA 17101 | Phone: 717-780-7200 |

| IN THE INTEREST OF | | | |
|---|---|---|---|
| Name: | Age: infant | DOB: 6/27/10 | Sex: female |
| Address: Hershey Medical Center | Phone Number(s): | | Phone Type: |
| | | | |

| Race: | | Ethnicity: |
|---|---|---|
| ☐ Asian/Pacific Islander<br>☐ Black<br>☐ Caucasian | ☐ Native<br>Tribal Affiliation: _____<br>☐ Unknown/Unreported | ☐ Hispanic<br>☐ Not Hispanic<br>☐ Unknown |

| CASE INFORMATION | |
|---|---|
| Type of Dependency: The child named above comes within the jurisdiction of the court as defined by The Juvenile Act at 42 Pa.C.S.§6302.<br>☒ Abuse / Neglect<br>  ☒ (1) ☐ (2) ☐ (3) ☐ (4) ☐ (10)<br>☐ Status Offense (Truancy, Incorrigibility, Ungovernable)<br>  ☐ (5) ☐ (6) ☐ (7) ☐ (8) ☐ (9) | Petition Type:<br>☒ Dependency Petition<br>☐ Dependency Petition - Aggravated Circumstances<br>☐ Dependency Petition Initiated by Private Petition |

| Protective Custody: | |
|---|---|
| ☐ Child is NOT in Protective Custody<br>  Location of the child is: _____<br>☐ Child remains in home but is in imminent risk of placement | ☒ Child is in Protective Custody (removed from the home and under supervision of the county agency<br>Date: 6/27/10     Time: _____<br>Location of the child is: Hershey Medical Center |

| CHILD'S PARENTS AND/OR OTHER LEGAL GUARDIAN OR CUSTODIAN | | |
|---|---|---|
| Mother's Name:<br>Jodi Ferris | Father's Name:<br>Scott Alan Ferris | Legal Guardian's or Custodian's Name: |
| DOB: unk. | DOB: 4/4/65 | Relationship:          DOB: |
| Address: 211 Tunnel Street<br>Williamstown, PA 17098 | Address: 211 Tunnel Street<br>Williamstown, PA 17098 | Address: |

| Phone Number(s): | Phone Type: | Phone Number(s): | Phone Type: | Phone Number(s): | Phone Type: |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

| ☐ Whereabouts Unknown | ☐ Whereabouts Unknown | ☐ Whereabouts Unknown |
|---|---|---|
| ☐ Closest Relative — If whereabouts unknown for Parents and Guardian<br>Name:<br>Address:<br>Phone Number:<br>Relation to Child: | | ☐ Additional Participants with Relationship to Child (see attached) |

| CHILD'S ATTORNEY/GUARDIAN AD LITEM | |
|---|---|
| Attorney Name: | Guardian Ad Litem Name: Joy Fleming, Esquire |
| Address: | Address: 91 Sylvan Ridge Road<br>Oberlin, PA 17113 |
| Supreme Court ID: | Supreme Court ID: |

 DEPENDENCY PETITION

## ADDITIONAL PARTICIPANTS WITH RELATIONSHIP TO CHILD

| Name | DOB | Address (Indicate if Whereabouts Unknown) | Phone (Indicate type ex. Cell Phone) | Relationship to Child |
|------|-----|-------------------------------------------|--------------------------------------|-----------------------|
|      |     |                                           |                                      |                       |
|      |     |                                           |                                      |                       |
|      |     |                                           |                                      |                       |
|      |     |                                           |                                      |                       |
|      |     |                                           |                                      |                       |
|      |     |                                           |                                      |                       |
|      |     |                                           |                                      |                       |
|      |     |                                           |                                      |                       |

DEPENDENCY PETITION

To the Honorable Judge of said Court:

The petitioner respectfully represents that the above mentioned child is a DEPENDENT CHILD, as defined by The Juvenile Act at 42 Pa.C.S.§ 6302.  It is within the Jurisdiction of the Court and in the best interests of said child and the public that this proceeding be brought before the Court for the following reasons:

The child

☒ 1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his/her physical, mental, or emotional health, or morals; a determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk;

☐ 2) has been placed for care or adoption in violation of law;

☐ 3) has been abandoned by his/her parents, guardian or other custodian;

☐ 4) is without a parent, guardian or other custodian;

☐ 5) while subject to compulsory school attendance is habitually and without justification truant from school;

☐ 6) has committed a specific act or acts of habitual disobedience of the reasonable and lawful commands of his/her parent, guardian, or other custodian and who is ungovernable and found to be in need of care, treatment or supervision;

☐ 7) is under the age of ten and has committed a delinquent act;

☐ 8) has been formerly adjudicated dependent, and who is under the jurisdiction of the court, subject to its conditions or placements and who commits an act which is defined as ungovernable; or

☐ 9) has been referred pursuant to an Informal Adjustment and who commits an act which is defined as ungovernable;

☐ 10) is born to a parent whose parental rights with regard to another child have been involuntarily terminated under 23 Pa.C.S. § 2511 (relating to grounds for involuntary termination) within three years immediately preceding the date of birth of the child and conduct of the parent poses a risk to the health, safety or welfare of the child.

Specifically, on or about June 28, 2010:
(*State the facts supporting the allegations. Attach additional pages if necessary.*)

_____

☒ Allegations attached

☒ Your petitioner avers that it would be contrary to the welfare, safety and health of the child to remain under the care of <u>her parents,</u>

DEPENDENCY PETITION

## AGGRAVATED CIRCUMSTANCES ALLEGATION

☐ The petitioner, having represented that this child is a DEPENDENT CHILD, also alleges the existence of aggravated circumstances

    ☐ The identity or whereabouts of the parents is unknown and cannot be ascertained and the parent has not claimed the child within three months of the date the child was taken into custody.

    ☐ The identity or whereabouts of the parents is known and the parents have failed to maintain substantial and continuing contact with the child for a period of six months.

    ☐ The child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect by the parent.

    ☐ The parent of the child has been convicted of the following offense(s), or the attempt, solicitation or conspiracy to commit the following offense(s), where the victim was a child:

        ☐ Criminal homicide under 18 Pa.C.S. Ch 25 (relating to criminal homicide);

        ☐ A felony under 18 Pa.C.S. § 2702 (relating to aggravated assault), 3121 (relating to rape), 3122.1 (relating to statutory sexual assault), 3123 (relating to involuntary deviate sexual intercourse), 3124.1 (relating to sexual assault) or 3125 (relating to aggravated indecent assault), to wit:

        ————————

        ☐ A misdemeanor under 18 Pa.C.S. § 3126 (relating to indecent assault).

        ☐ An equivalent crime in another jurisdiction, to wit:

        ————————

    ☐ The parental rights of the parent have been involuntarily terminated with respect to a child of the parent.

Wherefore, your petitioner prays your Honorable Court to fix a hearing to inquire into the matters alleged concerning the above named child and to make such order as deemed appropriate. If said child is found to be a dependent child and the Court determines that aggravated circumstances exist, your petitioner prays your Honorable Court to determine whether reasonable efforts to preserve and reunify the family shall be made or continue to be made and schedule any permanency hearing that may be required.

Further, if the child is found to be dependent and is to enter placement or commitment, or otherwise be removed from the child's home at disposition, the petitioner seeks the Court to enter such order of disposition, to determine that to allow the child to remain in the home would be contrary to the welfare of the child; to determine whether reasonable efforts were made to prevent such removal of the child from the child's home; or if preventive services were not offered due to the emergency nature of the situation, safety considerations, and circumstances of the family, whether this level of effort was reasonable.

 DEPENDENCY PETITION

If the Court determines, pursuant to 42 Pa.C.S. § 6332, that reasonable efforts were not made to prevent the initial removal of the child from the child's home, your petitioner prays your Honorable Court to determine, prior to entering an order of disposition under 42 Pa.C.S. § 6351, whether additional information is now available that would allow for a finding that such efforts were reasonable or whether reasonable efforts are underway to make it possible for the child to return home.

The Petitioner verifies and acknowledges that the facts set forth in the petition are true and correct to the petitioner's personal knowledge, information, or belief, and that any false statements are subject to penalties of the Crimes Code, 18 Pa.C.S. § 4904, relating to unsworn falsification to authorities.

Angelica Lopez-Heagy, Caseworker
PETITIONER NAME/TITLE

_Angelica Lopez-Heagy_          6/28/10
PETITIONER SIGNATURE                    DATE

Adjudicatory Hearing Request: Shelter Care hearing; June 28, 2010 at 12:00 p.m.
Adjudication and Disposition hearing; July 7, 2010 at 10:00 a.m.

 **DEPENDENCY PETITION**

## ALLEGATIONS OF DEPENDENCY

*(..Continuation of the facts supporting the allegations.)*

1. The subject minor female child,                                        was born on June 27, 2010.

2. The biological mother of the subject minor child is Jodi Ferris, DOB: unknown, who currently resides at 211 Tunnel Street, Williamstown, Pennsylvania.

3. The biological father of the subject minor child is Scott Alan Ferris, DOB: 4/4/65, who currently resides at 211 Tunnel Street, Williamstown, Pennsylvania.

4                                         is currently at Hershey Medical Center, Hershey, Pennsylvania.

5. It is alleged that                                         is dependent pursuant to 42 Pa.C.S. § 6302(1).

6. On June 27, 2010, the Agency received a referral regarding the parents and their newborn daughter,                         . According to the referral information, there were concerns as the mother was refusing all care for her and the child. The mother reportedly lied about having a midwife and receiving any prenatal care and wanted to leave against medical advice. The referral source was concerned that the parents would take the infant with them against medical advice.

7. On June 27, 2010; the Pennsylvania State Police and Williamstown EMS were dispatched at 9:14 a.m. to the family's home after a call was made regarding the mother who was in labor.

8. The ambulance transported the mother to the Hershey Medical Center where she delivered the baby in the ambulance before arriving at the hospital.

9. The infant,                         , was delivered at approximately 10:00 a.m.

10. The mother refused all care for herself and wanted to be discharged.  She also refused all routine and medical treatment for her daughter.

11. The mother initially told the medical staff at Hershey Medical Center that she was under the care of a midwife who would be following her post-partum care.  The mother refused to give them the number of the midwife, but Dr. Maines (an Ob-Gyn at Hershey Medical Center) was able to locate the midwife who stated there had been a consult with the family a couple of weeks ago, but that they refused her services. According to the midwife, the mother contacted her this morning when her contractions started around 7:00 a.m. and she instructed them to seek assistance from someone to help monitor the baby.

12. The mother and father wanted to leave the hospital against medical advice immediately and take the infant with them.  They requested the paperwork needed to sign out of the hospital against medical advice.

13. At that time, the nurse manager was contacted regarding the situation because there was a concern the parents were going to leave with the infant.

14. According to hospital staff, the mother had stated she was taking the baby with her.

DEPENDENCY PETITION

15. The mother denied stating that she was taking                with her and stated she was in agreement with letting the child stay in the hospital for 24 hours. The staff discussed the risks associated with the mother leaving against medical advice and she was given information regarding it.

16. The mother adamantly wanted to be discharged and requested the paperwork to sign out. The staff obliged her requests and allowed her to sign out against medical advice.

17. The parents were repeatedly asked to reconsider their position and explained the necessity of having the lab work completed and given certain treatment to the infant due to her unique delivery and unknown prenatal care.

18. The treatment team at Hershey Medical Center and the infant's pediatrician, Dr. Mallis, feel the child is at risk of harm if discharged from hospital and doesn't receive routine care provided for newborns at birth due to the lack of information regarding the mother and fathers past medical history and the fact there was no prenatal care prior to delivery.

19. In addition, the child is also premature at 36 weeks. The child's GBS (Groub B Strep Infection) status is unknown and they need to monitor child for at least 48 hours per recommendations from the American Academy of Pediatrics and the CDC. If the child is not monitored and has GBS this could lead to sepsis, meningitis, or pneumonia.

20. The child is also at high risk of jaundice due to her prematurity and because she has a large bruise on her forehead. In addition, as the mother is O- so she is set up for hyperbilinbinemia from hemolysis

21. On June 27, 2010, an officer from the Derry Township Police Department took emergency custody of                and released her to the Agency for further placement. (Exhibit A). remains at the Hershey Medical Center.

22. Due to the medical concerns for the newborn infant and the refusal from the family to provide the Agency with basic information to perform a comprehensive assessment is in the best interest of the child to be in the care and custody of Dauphin County Children and Youth.

23. In an effort to avoid placement, the Agency and the Hershey Medical Center team attempted to work with the mother and find a middle ground were the child's medical needs would be met but also the family's wishes were respected. The mother was given numerous opportunities to agree to the minimum requirements the hospital was requiring of the medical treatment of the.                She would verbally agree to some things but then change her mind. The mother refused to sign and documents without her lawyer being present. The mother also refused to sign a Safety Plan stating she would be in agreement with the child's medical treatment as outlined in the plan and agreed to by staff. On June 27, 2010, due to time constraints for necessary lab work and medical treatment the infant needed to have done, Hershey Medical Center, District Attorney's Office, Derry Township Police Department, and this Agency decided to take emergency custody of

24. There are no other resources to care for the subject minor child at this time.

25. At this time, it is not safe for                to remain in the care of her parents. The child's safety is jeopardized at this time because the parents are refusing to

DEPENDENCY PETITION

allow the necessary medical care needed for _____ due to her prematurity, lack of documented prenatal care, and unknown medical information for her mother.  If discharged early from the hospital, _____ could suffer life threatening consequences..  The parents were unable to provide the information for the child's pediatrician where she would be receiving medical follow-up.  The parents also refused to provide information to the Agency such as their home address, identifying information for the other children in the home, and their own identifying information so that the Agency could perform a comprehensive assessment of the family.

26. The subject minor child is currently under the supervision of the Agency.

27. It is unknown whether _____ has any Native American heritage which meets the definition under the Indian Child Welfare Act.

WHEREFORE, it is contrary to _____ 's welfare, health or safety and best interests to remain in her parents' care.  At this time, placement is necessary and cannot be prevented.

# EXHIBIT D

Commonwealth of Pennsylvania          :          IN THE COURT OF COMMON PLEAS OF
                                      :          DAUPHIN COUNTY, PENNSYLVANIA
    In The Interest Of:               :
                                      :          JUVENILE DIVISION
                          , A Minor   :
Date of Birth: 6/27/10                :          DOCKET NO.: CP-22-DP- 86 -2010
                                      :          FID: 22-FN- 50  -2010

ORDER OF COURT

AND NOW, this 28th day of _June_, 2010, upon presentation of the within petition

alleging the above captioned child to be dependent pursuant to 42 Pa. C. S. § 6302 and following due

consideration thereof, this Court has determined that to allow the said minor,                    , to

remain in the home would be contrary to her welfare, health and safety and best interests; and

IT IS HEREBY ORDERED AND DIRECTED that a duly authorized officer of the Court of Dauphin

County or any law enforcement officer shall take                    into custody wherever she may be

found within the jurisdiction of this Court and place her in the custody of Dauphin County Social Services for

Children and Youth until the Juvenile Court hearing.

BY THE COURT:

_Todd Hoover_

Todd A. Hoover, President Judge

DISTRIBUTION:

Honorable Todd A. Hoover
Clerk of Courts
Dauphin County Social Services for Children and Youth
William M. Shreve, Solicitor for Dauphin County Social Services for Children and Youth
Angelica Lopez-Heagy, Caseworker for Dauphin County Social Services for Children and Youth
Jodi Ferris, Mother, 211 Tunnel Street, Williamstown, PA 17098
Scott Alan Ferris, Father, 211 Tunnel Street, Williamstown, PA 17098