## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SCOTT FERRIS, JODI FERRIS, and<br>A.F., a minor, by her parents, | : | |
| | : | |
| Plaintiffs, | : | No. 1:12-cv-0442 |
| | : | |
| v. | : | Hon. John E. Jones III |
| | : | |
| MILTON S. HERSHEY MEDICAL | : | |
| CENTER; CAITLIN J. MALLIS, M.D., | : | |
| IAN M. PAUL, M.D., and JOHN DOE, | : | |
| M.D., physicians; JANE DOE, R.N., | : | |
| JANET DOE, R.N., registered nurses; | : | |
| JOHN ROE and JANE ROE, hospital staff | : | |
| members; JANET ROE and JACK ROE, | : | |
| risk management personnel, personally and | : | |
| in his official capacity; OFFICER RIAN | : | |
| BELL and OFFICER JAKE ROE, Derry | : | |
| Township police officers, and ANGELICA | : | |
| LOPEZ-HEAGY, social worker, personally | : | |
| and in her official capacities; and | : | |
| DAUPHIN COUNTY SOCIAL SERVICES | : | |
| FOR CHILDREN AND YOUTH, | : | |
| | : | |
| Defendants. | : | |

## **MEMORANDUM**

### September 29, 2016

Presently before the Court are a Motion for Summary Judgment filed by

Defendant Angelica Lopez-Heagy (doc. 100) and a Motion for Summary Judgment

filed by Ian M. Paul, M.D. and Caitlin J. Mallis, M.D (collectively, "HMC

Defendants"). (Doc. 103). The Motions have been fully briefed (docs. 102, 104,

109, 111, 115 & 117) and are thus ripe for our review.  For the reasons that follow, both Motions shall be granted in full.

## I.   FACTUAL BACKGROUND

We begin by noting that though the basic factual trajectory of this case is largely agreed to by the parties, a large number of disputes also remain.  The parties agree that on June 21, 2010, Plaintiffs attended a prenatal appointment with Certified Professional Midwife Dhyana Heller.  (Doc. 46, ¶ 19).  They further agree that Plaintiffs did not retain Heller as their midwife at that appointment.  (Doc. 110, ¶ 14).  However, Defendants allege that Plaintiffs refused Heller's services altogether at that time, and instead indicated to Heller that they would plan for unassisted at-home child birth.  (Doc. 103-2, ¶ 14).  Plaintiffs allege that while they did not retain Heller at that meeting, neither did they refuse Heller's services outright.  Rather, they intended to retain her at a later date and "needed some extra time to make financial arrangements."  (Doc. 110, ¶ 14; Doc. 46, ¶ 20).

The parties also agree that on June 27, 2010, at 7:00 a.m., prior to any further act to retain Heller, Mrs. Ferris went into labor.  (Doc. 46, ¶ 22).  Plaintiffs called Heller, but when she advised that she may not arrive in time, Plaintiffs called an ambulance, which took Mrs. Ferris to Hershey Medical Center ("HMC").  At 10:00 a.m., Mrs. Ferris gave birth to her baby, A.F., in the ambulance just outside of the emergency room door.  (*Id.* ¶¶ 21-29).  The parties do not dispute

that the ambulance crew members advised Mrs. Ferris not to "push" to speed the birth of A.F., and that Mrs. Ferris refused to cooperate with their requests and continued pushing, even after she was warned that A.F.'s umbilical cord was wrapped around her neck. [1]  As noted above, Mrs. Ferris ultimately gave birth to A.F. at 10:00 a.m. after three hours of labor.  (Doc. 103-2 ¶ 16; Doc. 110, ¶ 16).

While Defendants allege that A.F. was born after Mrs. Ferris had been pregnant for thirty-six and one-half (36.5) weeks, (doc. 103-2, ¶ 15), Plaintiffs assert that Mrs. Ferris was "anywhere from thirty-six (36) to thirty-eight (38)" weeks pregnant and had three estimated due dates ranging from July 3 to July 22, 2010.  (Doc. 110, ¶ 15).  Elsewhere in Plaintiffs' Response to the Statement of Undisputed Material Facts of Defendants, Plaintiffs allege that Mrs. Ferris was thirty-seven (37) weeks pregnant with a due date of July 12, 2010.  (Doc. 110, ¶ 17).

Immediately following A.F.'s birth, the baby was evaluated.  The E.M.S. records indicate that A.F. was blue, was not breathing, the umbilical cord remained wrapped around her neck, A.F. had a low heart rate of ninety (90) beats per minute, and she had an Apgar score of 1.[2]  (Doc. 103-2, ¶¶ 18-19; Doc. 110, ¶¶ 18-19).  As

---

[1]      Plaintiffs do dispute the qualifications of the ambulance crew and argue that they are not trained doctors or nurses and thus are not equipped to give "medical orders."  (Doc. 110, ¶ 16).
[2]      The parties briefing indicates that "Apgar scoring is a method used to evaluate a baby's health after birth by assigning a score of 0 to 2 for each of five categories: (i) appearance, (ii) pulse, (iii) grimace, (iv) activity, and (v) respiration."  (Doc. 103-2, ¶ 19 n. 2).  Thus, an overall Apgar score can range from 0 to 10.

a result, immediate active resuscitation was necessary, and was performed.  (*Id*.).

However, thereafter A.F. began to exhibit signs of respiratory distress.  Bruising on

her forehead was also observed, a "known risk sign" for jaundice. (Doc. 103-2, ¶¶

23-24; Doc. 110, ¶¶ 23-24).  The parties also agree that Mrs. Ferris presented with

a perineal tear, which was bleeding, and that she declined treatment for

approximately forty-five (45) minutes. [3]  Mrs. Ferris eventually agreed to have the

laceration repaired under local anesthesia.  Hospital records reflect that Mrs. Ferris

demanded that she be permitted to hold A.F while undergoing the repair procedure.

(Doc. 103-2, ¶ 27).[4]

After the procedure was completed, hospital staff members began to

question Mrs. Ferris regarding her medical history and treatment.  (*Id*., ¶ 28).  Mrs.

Ferris told Defendants that she did not know her Group B Strep ("GBS") status.

(*Id*.; Doc. 110, ¶ 28).  Mrs. Ferris also indicated that she received prenatal care

through a midwife, but the parties dispute whether Mrs. Ferris was willing to

provide the hospital staff with information concerning that midwife.  (Doc. 103-2,

¶ 30; Doc. 110, ¶ 30-31).[5]  The parties further dispute whether Mrs. Ferris also

stated that she would refuse all blood draws, labs, and immunizations for herself

---

[3]      The parties dispute the severity of the tear and cite to different witness testimony, with
Defendants arguing that the laceration was severe and potentially life-threatening (doc. 103-2, ¶
25) while Plaintiffs allege that the bleeding could have stopped "on its own."  (Doc. 110, ¶ 25).
[4]      Plaintiffs neither admit nor deny this allegation, but do not dispute that the HMC medical
records reflect this request.  (Doc. 110, ¶ 27).
[5]      As noted above, the parties also dispute whether Mrs. Ferris actually received prenatal
care, as they disagree on whether Plaintiffs intended to use Heller's services at all.

and A.F. at this time.  (Doc. 103-2, ¶ 29; Doc. 110, ¶ 29).  At some point, Defendants attempted to draw Mrs. Ferris' blood to determine her blood type, and inquired as to whether she might need a RhoGAM shot.[6]  (Doc. 103-2, ¶¶ 59-60).  The parties agree that Mrs. Ferris refused to allow Defendants to draw her blood.  (Doc. 110, ¶ 61).  The parties further agree that Mrs. Ferris advised Defendants that she had arranged to have the blood work done elsewhere; however, they disagree about whether Mrs. Ferris ever actually intended to have the testing completed.  (Doc. 103-2, ¶¶ 59-60; Doc. 110, ¶ 61).[7]

While the parties agree that Mrs. Ferris requested information about A.F. at this time, and that Defendant Dr. Mallis provided information about A.F. to Mrs. Ferris, the parties dispute its contents.  (Doc. 103-2, ¶ 31; Doc. 46, ¶ 61).  While Dr. Mallis testifies that she told Mrs. Ferris that A.F. had been admitted to the transitional nursery for further monitoring due to her respiratory distress, Plaintiffs allege that Dr. Mallis told Mrs. Ferris that "the baby was doing really well and that the nurses would bring the baby to her soon."  (Doc. 46, ¶ 61).

At 11:00 a.m. in the morning on June 27, 2010, Mrs. Ferris and A.F. were transferred to the Department of Obstetrics and admitted into a room directly

---

[6]     According to Defendants' Statement of Material Facts (Doc. 103-2), a RhoGAM shot is an injection provided to Rh negative mothers who may have given birth to a baby with an incompatible blood type, in order to prevent the mother from developing antibodies which could cause complications with further pregnancies.  (Doc. 103-2, ¶ 59 n. 5).

[7]     Defendants allege, and Heller testifies, that Mrs. Ferris never discussed the need for blood testing or the RhoGAM shot with Heller, while Mrs. Ferris testifies that she did discuss Heller's administration of the shot.  (Doc. 110, ¶ 61).

across the hall from a nursing station.  (Doc. 103-2, ¶¶ 32-35).  Plaintiffs initially

alleged that a "guard nurse" was stationed outside of Mrs. Ferris's room to prevent

her from exiting.  (Doc. 46, ¶¶ 77-85).  The HMC Defendants admit that the

configuration might give someone that impression, but allege that there was never

a nurse stationed outside the room to prevent Mrs. Ferris from leaving.  (Doc. 103-

2, ¶ 36).  Plaintiffs now agree with Defendants that no such guard nurse was

stationed outside the room, but allege that on the afternoon of June 27th, when

Mrs. Ferris attempted to leave her room, at least three nurses prevented her from

doing so and told her she was not allowed to come out.  (Doc. 110, ¶¶ 36, 122).

The parties agree that, at 11:30 a.m., Dr. Mallis and Mr. and Mrs. Ferris met

to discuss A.F.'s care.  (Doc. 103-2, ¶ 37; Doc. 110, ¶ 37).  They further agree that

Dr. Mallis explained that A.F. needed certain treatments (triple dye, vitamin K and

erythromycin) to prevent complications.  (Doc. 103-2, ¶ 37).[8]  However, Plaintiffs

allege that Dr. Mallis did not explain that the complications were potentially life-

threatening.  (Doc. 110, ¶¶ 37, 44, 46).  Meanwhile, the HMC Defendants allege

---

[8]     The parties agree that, at the time of A.F.'s birth, triple dye was the recommended
treatment and is "applied to a newborn's umbilical cord to prevent deadly blood infections and
other serious infections."  (Doc. 112, ¶ 24).  The parties further agree that babies are born
vitamin K deficient and so a vitamin K injection is often administered to prevent potentially life-
threatening bleeding and to assist with blood clotting.  (*Id.*, ¶ 25).  The parties also agree that
erythromycin ointment is typically applied to a newborn's eyes to treat bacteria that may have
transferred to the baby during a vaginal birth in order to prevent eye infections that have the
potential to cause blindness.  (*Id.*, ¶ 26).

that the danger to A.F. should she not receive the treatments was made clear.

(Doc. 103-2, ¶ 37).

The parties ultimately agree that Plaintiffs refused to allow A.F. to receive

the treatments.  (*Id.*, ¶¶ 47-48).  The parties further agree that Dr. Mallis explained

that A.F. needed to stay in the hospital for observation due to Mrs. Ferris'

unknown GBS status and the risk of infection and sepsis, and that for infants with

unknown GBS status, certain laboratory studies should be performed at twelve and

twenty-four hours of life.  The parties agree that a newborn with Group B strep can

die from acquiring meningitis, sepsis, and/or pneumonia.  (Doc. 112, ¶ 28).

Plaintiffs refused to consent to allow A.F. to stay.  (Doc. 103-2, ¶ 49).[9]

At 12:40 p.m. the same afternoon, another discussion commenced, this time

between Mrs. Ferris and Dr. Maines.  (Doc. 103-2, ¶¶ 57-58; doc. 110, ¶¶ 58-59).

The parties agree that the purpose of the discussion was to discuss testing for A.F.

(*Id.*).  At that time, Mrs. Ferris again declined to allow HMC staff to perform any

testing on A.F.  (*Id.*).[10]

At 1:40 p.m., the parties concur that Dr. Maines and Mrs. Ferris again

communicated, this time about the need for Mrs. Ferris to receive a RhoGAM shot.

The parties agree that Mrs. Ferris indicated that she was unaware of Mr. Ferris'

---

[9]     Plaintiffs clarify that though they did not consent to A.F. remaining at the hospital for
observation, they were not provided with enough information by the HMC staff regarding the
status of A.F.'s condition when they made that determination.  (Doc. 103-2, ¶ 56).

[10]     The parties dispute whether the testing recommended for A.F. was medically necessary.
(Doc. 110, ¶ 58).

blood type, again refused to receive the injection, and explained that she intended to receive the necessary testing and the injection from an outside provider.  (Doc. 110, ¶ 62).  The parties agree that, although Dr. Maines inquired, Mrs. Ferris again did not provide Dr. Maines with the contact information for Midwife Heller at this time.[11]  The parties dispute whether Mrs. Ferris was willing to, or provided Dr. Maines with, Midwife Heller's name.  (Doc. 110, ¶ 66).  The parties agree that Plaintiffs repeatedly expressed a desire to leave the hospital with A.F. as soon as possible.  (Doc. 103-2, ¶ 64; Doc 110, ¶ 65).

The parties do agree that eventually, HMC medical staff came into contact with Midwife Heller, who stated that the Plaintiffs had refused her services.  (Doc. 103-2, ¶ 66).  Plaintiffs allege that Midwife Heller inaccurately represented their communications to Defendants, and that Mrs. Ferris had not in fact refused Heller's services.  (Doc. 110, ¶¶ 67-68).

The parties also agree that, at 2:00 p.m., Nurse Maria Butch assisted Mrs. Ferris in going to the bathroom, and that "Jodi refused to put down A.F. throughout nearly the entire process of urinating."  (Doc. 103-2, ¶ 68; Doc. 110, ¶ 69).

At 2:45 p.m., the parties agree that Plaintiffs and Dr. Mallis had a meeting to explain the hospital's procedure for early discharge.  They agree that the

---

[11]     Plaintiffs allege that Mrs. Ferris told Dr. Maines that she had Heller's contact information at home and would provide it to them when she arrived home.  (Doc. 110, ¶ 63).

Defendants explained that the baby was born prematurely,[12] that her GBS status remained unknown, and that the baby was at risk for jaundice.  (Doc. 110, ¶ 70). Parties also discussed the requirements for an early discharge of A.F.  (*Id.*, ¶ 71). Ultimately, Defendants explained that A.F. was not a candidate for early discharge. (Doc. 112, ¶ 38).[13]  Defendants also testified that they explained that because Mrs. Ferris' Hepatitis B status was unknown, a Hepatitis B vaccine had to be administered to A.F. within the first twelve (12) hours of her life to prevent transmission.  (Doc. 103-2, ¶¶ 71-72).  Plaintiffs deny that this was discussed. (Doc. 110, ¶ 73).[14]  Parties dispute whether Defendants stated that, if needed, they would contact Children and Youth Services ("CYS") and obtain a court order to keep A.F. at this time.  (*Id.*, ¶ 70).[15]

Parties agree that at 4:00 p.m., Dr. Mallis returned and again requested that Mrs. Ferris consent to HMC's administration of treatment that Defendants

---

[12]     Plaintiffs agree that Dr. Mallis stated that A.F. was premature; as noted above, they dispute this as a matter of fact.

[13]     HMC's discharge procedures required that a newborn could be discharged after 24 hours only when medically sound, the parents have a car seat and a doctor's appointment is scheduled for their newborn for the day after discharge.  As Plaintiffs had not fulfilled these two requirements, A.F. was not a candidate for early discharge.  (Doc. 112, ¶¶ 37-38, 39).  The parties dispute whether A.F. was sufficiently medically sound to be discharged.

[14]     Plaintiffs further dispute whether the Hepatitis B vaccine was medically necessary.  (Doc. 110, ¶ 74).

[15]     While in their response to the HMC Defendants' Statement of Undisputed Material Facts, Plaintiffs dispute this statement, in Plaintiffs' response to Defendant Lopez-Heagy's Statement of Undisputed Material Facts (Doc. 112), Plaintiffs indicate that the HMC Defendants did indeed tell Plaintiffs that they would involve CYS if Plaintiffs would not consent to "necessary" minimum care.  (Doc. 112, ¶ 45).  There, Plaintiffs simply dispute the statement that the care was necessary.  (*Id.*).

described as "necessary," though Plaintiffs contest whether this assessment was accurate.  (Doc. 103-2, ¶¶ 74-76; Doc. 110, ¶¶ 75-78).  The HMC Defendants assert that Mrs. Ferris again refused to allow HMC to treat A.F.  (Doc. 102-3, ¶ 77).  Importantly, Plaintiffs, however, allege that Mrs. Ferris "was willing to allow the vitamin K injection if HMC could verify that A.F. had not already had it. . . . Scott and Jodi had also verbally told Hershey that they agreed to permit the hospital staff to perform a white blood cell count and . . . Hepatitis B testing." (Doc. 110, ¶ 78).  The parties do agree that at 4:15 p.m., Mrs. Ferris signed herself out of the hospital against medical advice.  (Doc. 110, ¶ 82).

Following this meeting, the HMC Defendants contacted CYS and reported suspected child neglect.  (Doc. 103-2, ¶ 78).  Defendant Lopez-Heagy, an employee of CYS, soon arrived at the hospital and communicated with hospital staff about all that had transpired since Plaintiffs had arrived.  (Doc. 103-2, ¶¶ 82, 84; Doc. 112, ¶¶ 47-49).  Defendant Lopez-Heagy then spoke with Plaintiffs, explaining that the allegations were that Plaintiffs were not authorizing the staff to perform medical care, and that if they could not come to a resolution, A.F. would be taken into protective custody.  (Doc. 112, ¶¶ 49-50).  At some point during the conversation, Mr. Ferris left the hospital to tend to Plaintiffs' other children.  (Doc. 112, ¶ 51).

Defendant Lopez-Heagy alleges that, after this conversation, she prepared a "safety plan" outlining required medical treatment based on recommendations of the HMC medical staff, and that she spent the next three hours requesting that Mrs. Ferris review and sign the plan.  (Doc. 103-2, ¶¶ 89-91; Doc. 112, ¶¶ 55-56). Defendant Lopez-Heagy alleges that Mrs. Ferris refused to comply with her requests, while significantly, Plaintiffs allege that no written safety plan was ever presented to Mrs. Ferris during this time.  (Doc. 110, ¶ 90; Doc. 103-2, ¶¶ 90-91). Plaintiffs further allege that Mrs. Ferris told Defendant Lopez-Heagy that she wanted to wait for her husband to return to discuss their religious beliefs.  (Doc. 112, ¶ 58).  Plaintiffs maintain that they continued to consent to certain treatments, including the vitamin K injection, white blood cell count, and Hepatitis B testing. (Doc. 112, ¶ 56).  The parties agree that Plaintiffs continued to refuse to allow A.F. to receive a Hepatitis B vaccine, erythromycin, triple dye, refused to consent to the 48-hour observation period, and other testing.  (Doc. 112, ¶ 60).

Ultimately, the parties agree that Defendant Lopez-Heagy contacted the Derry Township Police Department, though they dispute the exact time that she did so.[16]  Plaintiffs allege that the police officers arrived between 7:00 p.m. and 7:15 p.m. (doc. 110, ¶ 97), while the HMC Defendants assert that they did not arrive

---

[16]     Defendant Lopez-Heagy alleges that she contacted her supervisor at CYS at 6:56 p.m. and was instructed to contact the police department.  (Doc. 103-2, ¶¶ 91-92).  Plaintiffs argue that the call to the CYS supervisor must have occurred earlier because Defendant Lopez-Heagy contacted the police at 6:47 p.m.  (Doc. 110, ¶ 92; Doc 110-19, 25:21-25). This dispute is significant because ultimately the parties contest the time that A.F. was taken by the police.

until between 8:00 p.m. and 8:15 p.m.  (Doc. 103-2, ¶ 96).  Defendant Lopez-Heagy alleges that they arrived at 6:45 p.m.  (Doc. 112, ¶ 66).  All parties agree that upon their arrival, the police officers and specifically Officer Bell met with both Defendant Lopez-Heagy and Mrs. Ferris to discuss the situation, though they disagree as to the subject matter of those discussions.  (Doc. 103-2, ¶¶ 97-99; Doc. 110, ¶¶ 98-100; Doc. 112, ¶ 67).  Ultimately, Officer Bell concluded that "there are reasonable grounds to belief [A.F.] is suffering from illness or injury or is in imminent danger from her surroundings, and that her removal is necessary" and issued an emergency custody order.  (Doc. 103-2, ¶ 100).

The parties further agree that Defendant Lopez-Heagy reached out to Judge Todd A. Hoover of the Dauphin County Court of Common Pleas to obtain verbal authorization for the HMC staff to provide A.F. with the medical treatments that they deemed necessary, and that at 8:00 p.m., Judge Hoover issued the authorization and informed the HMC medical staff that he had taken custody of A.F.  (*Id.*, ¶¶ 94-95; Doc. 100, ¶¶ 95-96).  However, Plaintiffs allege that the police officers took custody of A.F. before 8:00 p.m.  (Doc. 110, ¶ 95).  The parties agree that treatments on A.F. began at 8:20 p.m.  (*Id.*, ¶ 106).  The following morning the Court of Common Pleas entered an Order directing that CYS take custody of A.F.  (Doc. 103-2, ¶ 109; doc. 110, ¶ 110).  Within twenty-four (24) hours, following her

medical clearance by the HMC Defendants, A.F. was returned to the custody of her parents.  (Doc. 103-2, ¶ 110; Doc. 110, ¶ 111).

## II.    PROCEDURAL HISTORY

Plaintiffs Scott and Jodi Ferris and their daughter, A.F., a minor, initiated the above-captioned suit with a Complaint (doc. 1) filed on March 9, 2012.  Since that time, this case has followed a lengthy and complex path of litigation.  Defendants Angelica Lopez-Heagy and Dauphin County Social Services for Children and Youth filed a Motion to Dismiss (doc. 20) on May 18, 2012.  Defendants Dr. Caitlin J. Mallis, Dr. Ian Paul, and HMC filed another Motion to Dismiss (doc. 36) soon thereafter, on June 18, 2012.  In a Memorandum and Order (doc. 45) dated August 22, 2012, this Court addressed both Motions and dismissed a portion of Plaintiffs' claims and granted Plaintiffs leave to amend their Complaint.

On September 12, 2012, Plaintiffs filed an Amended Complaint.  (Doc. 46).  Defendants Colin MacNeill, M.D.,[17] Caitlin Mallis, M.D., and Ian M. Paul, M.D. as well as Hershey Medical Center again filed a Motion to Dismiss.  (Doc. 48).  Soon thereafter, Officer Bell and Officer Clements were voluntarily dismissed by Plaintiffs.  (Doc. 62).  In a Memorandum and Order (doc. 64) issued by this Court on November 30, 2012, the Motion to Dismiss filed by the HMC Defendants was

---

[17]    Defendant Colin MacNeill was only added pursuant to Plaintiff's Amended Complaint. Thus, his name does not appear in the case caption above.  Claims against Defendant MacNeill were dismissed by stipulation of the parties on November 20, 2015.  (Doc. 95).

granted in part and denied in part, with all remaining claims by Plaintiffs preserved save those against HMC itself, pursuant to this Court's finding that Plaintiffs failed to articulate an institutional policy, custom or practice that could subject HMC to Section 1983 liability.

Relevant to the instant Motion, Plaintiffs' remaining claims are as follows: Fourteenth Amendment due process violations alleged against Defendants Angelica Lopez-Heagy, Caitlin Mallis, M.D., and Ian M. Paul, M.D.; Fourth Amendment constitutional violations premised on the seizure of A.F. alleged against the same Defendants; and a Pennsylvania state law false imprisonment claim against Angelica Lopez-Heagy, alleging that Defendant Lopez-Heagy unlawfully detained A.F. without the consent and over the objection of her parents.

Plaintiffs allege that as a result of the above-described violations, they have suffered and will continue to suffer severe emotional distress; emotional distress; and loss of enjoyment of life.  (Doc. 46, ¶ 197).  As relief for these injuries, Plaintiffs request that this Court enter judgment in their favor, finding that Defendants intentionally and illegally violated Plaintiffs' constitutional rights; award compensatory damages; punitive damages insomuch as Defendants willfully and wantonly disregarded Plaintiffs' rights; costs and attorney's fees pursuant to 42 U.S.C. § 1988; and any other relief as this Court may deem just and proper.  (Doc. 46, ¶ 197).

## III.   STANDARD OF REVIEW

Summary judgment is appropriate if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A dispute is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a fact is "material" only if it might affect the outcome of the action under the governing law.  *See Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 172 (3d Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A court should view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences therefrom, and should not evaluate credibility or weigh the evidence.  *See Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 772 (3d Cir. 2013) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

Initially, the moving party bears the burden of demonstrating the absence of a genuine dispute of material fact, and upon satisfaction of that burden, the non-movant must go beyond the pleadings, pointing to particular facts that evidence a genuine dispute for trial.  *See id.* at 773 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  In advancing their positions, the parties must support their factual assertions by citing to specific parts of the record or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or

that an adverse party cannot produce admissible evidence to support the fact."
FED. R. Civ. P. 56(c)(1).

A court should not grant summary judgment when there is a disagreement about the facts or the proper inferences that a factfinder could draw from them. *See Reedy v. Evanson*, 615 F.3d 197, 210 (3d Cir. 2010) (citing *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982)).  Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Layshock ex rel. Layshock v. Hermitage Sch. Dist.*, 650 F.3d 205, 211 (3d Cir. 2011) (quoting *Anderson*, 477 U.S. at 247-48) (internal quotation marks omitted).

## IV.   ANALYSIS

As noted above, three counts remain pending in Plaintiffs' Amended Complaint.  Of those, two counts are outstanding against the HMC Defendants who brought the instant Motion for Summary Judgment, Dr. Ian M. Paul and Dr. Caitlin J. Mallis.  The first count alleges a Fourth Amendment violation premised on the unlawfully conducted seizure of A.F.  The second count alleges that Plaintiffs were deprived of procedural due process as there was no emergency circumstance to justify the decision to remove A.F. from Plaintiffs' custody.  (Doc. 46, ¶ 191).  We first address the Plaintiffs' claims with respect to the HMC

Defendants, before moving on to the claims asserted against Defendant Lopez-Heagy.

## A.    Fourth Amendment Claim Against HMC Defendants

As noted, Plaintiffs allege a Fourth Amendment violation against the HMC Defendants in relation to the seizure of their daughter A.F. within the first hours of her life.  HMC Defendants argue that the seizure of A.F. was objectively reasonable and justified under the circumstances known to them at the time it occurred.  As such, they argue that Plaintiffs have failed to make out a Fourth Amendment claim as a matter of law.  The HMC Defendants also argue that they are entitled to qualified immunity as, even if this Court finds that their actions were unjustified, no reasonable physician under the circumstances could have believed his or her actions to be unlawful at the time they were committed.  Because we find that the HMC Defendants acted reasonably under the circumstances as they were known at the time of the seizure, we conclude that no Fourth Amendment violation in fact occurred.[18]

### i.    Whether Defendants violated the Fourth Amendment

In order to show a Fourth Amendment violation, "a plaintiff must show that the defendants' actions (1) constituted a "search" or "seizure" within the meaning

---

[18]     In *Miller v. City of Phila.*,174 F.3d 368 (3d Cir. 1999) the Third Circuit explained that "the proper approach . . . is to ascertain whether a constitutional violation has been alleged before determining if qualified immunity is available." *Miller*, 174 F.3d at 374.

of the Fourth Amendment, and (2) were "unreasonable" in light of the surrounding circumstances." *Adkins v. Luzerne Cnty. Children & Youth Servs.*, No. 3:CV-01-0470, 2005 WL 2129921, at *7 (M.D.Pa, September 2, 2005) (Vanaskie, J.) (finding that "the actions taken by Defendants were an appropriate and effective means of resolving the concern of the potential abuse of [Plaintiff's] children.").

In the instant case, the HMC Defendants argue that the seizure of A.F. was not unreasonable, but was justified under the circumstances known at the time. (Doc. 104, p. 8). "[T]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Adkins*, 2005 WL 2129921, at *7 (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)). Rather, the seizure must be examined for overall reasonableness "based upon a 'careful balancing of governmental and private interests.'" *Id.* (quoting *Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 71 (1992) ("[R]easonableness is still the ultimate standard under the Fourth Amendment.") (citation omitted)).

The HMC Defendants may be entitled to summary judgment where the facts show that "a reasonable person in the circumstances surrounding their [actions] could have believed . . . that [A.F.] was in imminent danger of serious bodily injury and that their intrusions were reasonably necessary to avert that injury." *Good v. Dauphin Cnty. Social Servs.*, 891 F.2d 1087, 1095 (3d. Cir. 1989); *see Brown v. Daniels*, 128 Fed. Appx. 910, 914-15 (3d Cir. 2005) ("It is well-settled

that 'in emergency circumstances which pose an immediate threat to the safety of a child, officials may temporarily deprive a parent of custody without parental consent or an order of the court'") (internal citations omitted).

We turn now to an inquiry as to whether the facts presented comprise reasonable evidence that A.F. was in danger.  Indeed, it is this analysis upon which the majority of the legal questions presented in this submission turn.  The summary of the Factual Background, *supra* Section I, shows that the parties dispute myriad factual matters regarding the events that transpired on June 27, 2010.  As Plaintiffs remind us, where genuine issues of material fact remain in dispute, a ruling at the summary judgment stage is usually inappropriate, as all disputes concerning material facts are to be construed in favor of the non-movant.[19]

With this standard in mind, we focus predominantly on the facts to which the parties agree.  The parties agree that Mrs. Ferris disregarded the advice of the EMTs in the ambulance not to "push" to hasten A.F.'s birth, (doc. 110, ¶¶ 14, 16), and that when A.F. was born outside of the hospital, she was not breathing, blue, and had her umbilical cord wrapped around her neck.  (Doc. 110, ¶ 18).  A.F. also had an Apgar score of 1.  (*Id.*, ¶ 19).  The parties further agree that immediate active resuscitation was necessary, and was performed.  (*Id.*, ¶ 18).  Thereafter A.F. began to exhibit signs of respiratory distress and bruising on her forehead was

---

[19]      (Doc. 109, p. 10).

observed, a "known risk sign" for jaundice.  (Doc. 103-2, ¶¶ 23-24; Doc. 110, ¶¶ 23-24).

The parties also agree that around 11:30 a.m., Plaintiffs and the HMC medical staff began to engage in specific and active discussion about additional treatments for A.F.  They further agree that Dr. Mallis explained that, in her view, A.F. needed certain treatments (triple dye, vitamin K and erythromycin) to prevent complications.  (Doc. 103-2, ¶ 37).   The HMC Defendants further explained that A.F. required observation due to Mrs. Ferris' unknown GBS status and the risk of infection and sepsis.  (Doc. 103-2, ¶ 49).

Defendants allege that Plaintiffs consistently and repeatedly withheld their consent to perform all of the above-described testing and treatment.  (Doc. 104, p. 9). Importantly, Plaintiffs, however, allege that at 4:00 p.m., Mrs. Ferris "was willing to allow the vitamin K injection if HMC could verify that A.F. had not already had it. . . .  Scott and Jodi had also verbally told Hershey that they agreed to permit the hospital staff to perform a white blood cell count and . . . and Hepatitis B testing."  (Doc. 110, ¶ 78).

This discrepancy in the record represents an important dispute of fact.  "It is true that 'conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment.'"  *Kirleis v. Dickie, McCamey, & Chilcote, P.C.*, 560 F.3d 156, 161 (3d. Cir. 2009) (citing *Blair v. Scott Specialty Gases*, 283 F.3d 595, 608

(3d Cir. 2002)).  "Instead, the affiant must set forth specific facts that reveal a genuine issue of material fact."  *Id*. (citing Fed. R. Civ. P. 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather its response must  . . . set out specific facts showing a genuine issue for trial.")).

We find that the Plaintiffs' statements regarding their alleged consent to certain treatments are not conclusory.  Rather, they are specific factual averments supported by Plaintiffs' deposition testimony.  Mrs. Ferris specifically alleges which tests she consented to, and provides additional information on her rationale regarding the vitamin K shot, including testimony as to her request for additional information on whether A.F. had already received the injection.  That these statements are unsupported by the hospital records or by the HMC Defendants' failure to administer the treatments after Plaintiffs consented to them is a consideration that would require this Court to weigh the evidence before us, which is an inquiry improper to undertake on a motion for summary judgment.  *Kirleis*, 560 F.3d at 161-62 ("Had [Defendant] submitted contradictory evidence . . . the task of weighing the evidence and choosing which side to believe would have been for a jury" (citing *Par-Knit Mills, Inc. v. Stockbridge Fabrics, Co*., 636 F.2d 51, 54 (3d Cir. 1980)).

Because we find that genuine issues of material fact exist regarding whether Plaintiffs consented to the vitamin K injection, a white blood cell count, and hepatitis B testing, we cannot rule on whether these issues appropriately contributed to Defendants' conclusion that A.F. was at risk of serious health consequences from lack of treatment.  Rather, we consider the factual matters not in dispute.  These include Plaintiffs' refusal to allow Defendants to administer triple dye, erythromycin, a Hepatitis B vaccine (without first engaging in the disputed Hepatitis B testing) and to keep A.F. for a longer period of observation due to Mrs. Ferris' unknown GBS status and the risk of infection and sepsis.  (Doc. 103-2, ¶ 49).  All parties agree that Plaintiffs refused to consent to these recommended measures.

Defendants argue that Plaintiffs' own expert, Nurse Jnah, confirms that these treatments and the observation of A.F. were medically necessary.  (Doc. 115, ¶ 7).  A close read of Nurse Jnah's expert report belies this overly broad characterization, however.  Jnah opines that the use of erythromycin and triple dye is not medically necessary, and "[s]ome parents decline that this recommended therapy be provided to their newborns.  Triple dye . . . is not considered a standard of care across hospitals and states."  (Doc. 103-5, p. 4).  Furthermore, Jnah explains that "Jodi Ferris' refusal to approve the use of triple dye and erythromycin eye ointment on

her infant daughter was not medically sufficient, in isolation from all other factors, to remove the child from her custody." (*Id*.).

However, Defendants did not base their decision to take custody of A.F. on the Ferris' refusal to consent to the use of erythromycin and triple dye in isolation from all other factors. They also harbored concerns about whether Plaintiffs would consent to a Hepatitis B vaccine, and that A.F. was at risk for sepsis and requested that A.F. remain at the hospital for observation. In regards to the sepsis concerns, indeed Nurse Jnah's report concurs with the HMC Defendants' desire to administer this treatment. She opines that "it was appropriate for the [HMC] team to desire to obtain a complete blood count and blood culture as well as monitor the baby in-house for 48 hours." (*Id*.). It is undisputed that Plaintiffs refused to consent to these tests and to allow A.F. to remain at the hospital for observation, at best assenting only to the white blood cell count. (Doc. 110, ¶¶ 49-54). Rather, Plaintiffs argue that Nurse Jnah's opinions on these medical issues are not relevant, as they pertain to an infant born after less than thirty-seven (37) weeks of gestation. Plaintiffs contend that A.F. was born at thirty-seven weeks and not before. Plaintiffs further contend that the gestation period is a genuine dispute of material fact precluding summary judgment.

We disagree with Plaintiffs' assertion regarding the gestation period. Unlike Plaintiffs' sworn deposition testimony that they consented to certain treatments for

A.F., the deposition testimony that Plaintiffs submit regarding A.F.'s gestation period is directly controverted by other of their own submissions. Plaintiffs argue that A.F. was born after a gestation period of thirty-seven weeks, but elsewhere in their submissions they admit that they do not know how long Mrs. Ferris was pregnant, and that Mrs. Ferris had received opinions regarding three separate due dates, all of which indicate that A.F. was born pre-term. While the parties can dispute the status of A.F. as premature, the record shows that at best, Plaintiffs were unaware of A.F.'s status at the crucial time that the HMC Defendants were determining A.F.'s health risks. Rather, Plaintiffs' expert Nurse Jnah submits that, given the undisputed factual circumstances surrounding A.F.'s birth, "sufficient concern for proper dating and potential for infant to be considered < 37 weeks is evident." (Doc. 103-5, p. 4).

Even taking the facts in the light most favorable to the non-movant, as we must do here, we cannot find that a genuine dispute of material fact exists. Rather, we conclude that the HMC Defendants were, like Plaintiffs, unsure of how long Mrs. Ferris was pregnant before A.F. was born. The record shows that the time period was between thirty six weeks and three days, and thirty seven weeks. Given that A.F. was born blue and not breathing, and that Plaintiffs' own expert opined that A.F. presented with sufficient symptoms to indicate that A.F.'s gestation period was less than thirty-seven weeks, we find that as a matter of law Defendants

were reasonable to find a significant risk that A.F. was premature.  Defendants were therefore justified in treating her as such.

The issue of A.F.'s period of gestation is of utmost importance because it dictates whether the HMC Defendants were reasonable in requesting that A.F. remain for observation and in their assessment that A.F. was at risk for sepsis and other health concerns.  Having resolved this issue, we turn back to the evidence in record concerning A.F.'s health.  Nurse Jnah's report indicates that "[s]creening an infant for sepsis, by means of a complete blood count, blood culture, a minimum of 48 hours of close observation, and the potential provision of intravenous antibiotics, is indicated in situations where the maternal GBS status is unknown, and there are sufficient concerns for sepsis." (*Id.*).  The parties agree that Mrs. Ferris' GBS status was indeed unknown.  Jnah's report further details that

> the American College of Obstetrics and Gynecology state [sic] that Intrapartum GBS prophylaxis is indicated when with [sic] cases of unknown GBS status at the onset of labor AND delivery of < 37 weeks gestation (sufficient concern for proper dating and potential for infant to be considered < 37 weeks is evident).

(*Id.*).  Thus, Defendants are correct in their assertion that Plaintiff's own expert confirms that Defendants were justified in their desire to keep A.F. for observation, as evidence suggested A.F. was born both premature and her GBS states was unknown, therefore indicating that A.F. was at risk of Intrapartum GBS prophylaxis and sepsis.

25

This evidence, combined with Mrs. Ferris' refusal to approve the administration of a Hepatitis B vaccine, and the use of triple dye and erythromycin eye ointment on her infant daughter, would likely be enough to show that the HMC Defendants had acted reasonably in light of the surrounding circumstances such that a Fourth Amendment violation did not occur.  However, the parties also agree that the HMC Defendants had evidence that Plaintiffs had not retained a midwife or a pediatrician to care for Mrs. Ferris and A.F. following their discharge. Though Plaintiffs' allege that it was their intent to retain Midwife Heller, they do not contest that Defendants were in possession of information to the contrary, in the form of their conversation with Heller in which Heller vehemently denied being retained by Plaintiffs.  While the accuracy of Heller's statements is disputed, the fact that this information was conveyed to Defendants at the time they were assessing A.F.'s risk of health concerns is not.  The truth of Heller's statements is not at issue.  Rather, Heller's statements, taken at face value, provided reasonable justification for Defendants to fear that no such care would occur should A.F. be discharged, as Plaintiffs' desired.

Finally, evidence also shows that Mrs. Ferris engaged in not one but two separate scenarios that arguably endangered A.F.  First, Mrs. Ferris demanded to hold her newborn daughter while undergoing a medical procedure by which Mrs. Ferris' pereneal tear was repaired under local anesthesia.  Second, Mrs. Ferris

refused to put A.F. in her bassinet or in a nurse's care while urinating, only putting A.F. down to wash her hands.  These activities by themselves are not sufficient evidence that A.F. was in imminent danger; however, when taken in combination with all of the other circumstances surrounding A.F.'s health, Defendants were reasonable to conclude that A.F. was at risk of immediate threat to her safety should she be released to her parents' care without further treatment.

Ultimately, in view of all of the uncontested factual matter presented, we conclude that Defendants acted reasonably in their determination that emergency circumstances existed posing an immediate threat to the safety of A.F.  The HMC Defendants weighed the information available to them at the time and acted in what they reasonably believed to be the best interests of A.F.  As such, the second prong of a Fourth Amendment claim requiring Plaintiffs to show that Defendants acted unreasonably in light of the surrounding circumstances cannot be met. Plaintiffs have thus failed to allege a Fourth Amendment violation against the HMC Defendants.

### ii.      Whether HMC Defendants are entitled to qualified immunity

Although we have already concluded that a constitutional violation did not in fact occur, in an abundance of caution, we briefly analyze the doctrine of qualified immunity as it applies to the HMC Defendants.  The defense of qualified immunity provides that "government officials performing discretionary functions,

generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Good v. Dauphin Cnty. Social Servs*., 891 F.2d 1087, 1091 (3d. Cir. 1989) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1981)).

> Determining whether a state actor is entitled to the affirmative defense of qualified immunity generally involves two inquiries: (1) do the facts alleged show that a state actor violated a constitutional right, and (2) was the constitutional right clearly established so that a reasonable person would know that the conduct was unlawful? A right is clearly established if there is "sufficient precedent at the time of the action . . . to put [the] defendant on notice that his or her conduct is constitutionally prohibited. Courts are accorded 'discretion in deciding which of the two prongs of the qualified immunity analysis should be address first in light of the circumstances in the particular case at hand.

*Wilson v. Zielke*, 382 Fed. Appx. 151, 152 (3d. Cir. Feb. 9, 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223 (2009)*; McKee v. Hart*, 436 F.3d 165, 171 (3d Cir. 2006) (internal citations omitted)).

Having already determined that no constitutional violation occurred, we move to the second query applicable to an analysis of qualified immunity: whether the HMC Defendants would have been on notice that their conduct could have been viewed as unlawful.

We find no Fourth Amendment case law, and Plaintiffs have provided none, that would indicate that Defendants would have been aware that they were in danger of violating a previously existing, clearly established right. *See Callahan v.*

*Lancaster-Lebanon Intermediate Unit 13*, 880 F.Supp. 319, 333 (E.D.Pa. 1994) ("Turning to the specific context of child care workers, we find no Fourth Amendment case law, and plaintiffs have cited none, that would have put defendants on notice that their actions would violate any existing clearly established rights."). Furthermore, given the foregoing analysis, we now conclude that even if a Fourth Amendment violation had in fact occurred, Defendants would nevertheless be entitled to qualified immunity because the Plaintiffs' constitutional right was not so clearly established that a reasonable person would know their conduct had been unlawful.

As this Court initially observed while ruling in Defendants' Motion to Dismiss, courts have held that the Constitution protects a parent's fundamental due process liberty interest in the care, custody and management of his or her children, *Lehr v. Robertson*, 463 U.S. 248, 258 (1983), and that these rights can be infringed upon only in the face of objectively reasonable evidence that the child is in danger. *See Adkins*, 2005 U.S. Dist. LEXIS 19006 at *16-17. However, in an inquiry regarding qualified immunity, "the determination whether it was objectively legally reasonable to conclude that a given [seizure] was supported by . . . exigent circumstances will often require examination of the information possessed by the searching officials." *Good*, 891 F.2d at 1092 (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

We have already engaged in a comprehensive analysis of the information available to Defendants at the time they made their assessment of the danger confronting A.F.  Plaintiffs' refusal to allow A.F. to be treated with triple dye, erythromycin eye ointment, and a Hepatitis B vaccine, combined with their refusal to allow A.F. to stay at the hospital to be observed even after Defendants' explanation that she was at risk for Intrapartum GBS prophylaxis and sepsis, as well as the numerous other factors discussed above, conflate to provide sufficient information for a reasonable official in Defendants' position to conclude that the seizure of A.F. was supported by exigent circumstances, even if a court of law later determined that a Fourth Amendment violation had indeed occurred.  Therefore the HMC Defendants are entitled to qualified immunity and are exempt from liability regarding Plaintiffs' Fourth Amendment claims.

### B.     Fourteenth Amendment Claim Against HMC Defendants

Mindful that we have now concluded that A.F. was in imminent danger such that the deprivation of custody did not constitute a violation of the Fourth Amendment, we turn now to an analysis of Plaintiffs' Fourteenth Amendment procedural due process claims.

It has long been established that "the procedural due process analysis is distinct from the substantive due process analysis."  *Patterson v. Armstrong Cnty. Children and Youth Servs.*, 141 F.Supp.2d 512, 529 (W.D.Pa. 2001) (finding that

while a substantive due process violation had not occurred, police nevertheless violated procedural due process requirements when they failed to provide a mother with a post-deprivation hearing within 72 hours of taking her daughter into protective custody).  The words of the Due Process Clause establish that, "at a minimum . . . deprivation of life, liberty or property by adjudication be preceded by notice and an opportunity for hearing appropriate to the nature of the case." *Id.* at 530 (quoting *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306, 313 (1950)). In order to state a § 1983 claim for the deprivation of procedural due process, "a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection . . . and (2) the procedures available to him did not provide 'due process of law.'" *Dennis v. Dejong*, 557 Fed. Appx. 112, 116 (3d Cir. 2014).

"In assessing whether parents have received procedural due process where a child has been removed from their care, we have recognized that the private interest 'springs from the parent-child relationship,' and that . . . there is a 'fundamental liberty interest of natural parents in the care, custody and management of their children.'" *Id.* (quoting *Miller v. City of Phila.*, 174 F.3d 368, 373 (3d Cir. 1999)).  "Given the flexible nature of the due process inquiry and the myriad of situations in which the inquiry arises,

> courts have found that even though parents have a fundamental liberty
> interest in the custody of their children they do not always have a right to

> prior process when the state removes their children from their custody.
> Courts agree that 'in emergency circumstances which pose an immediate
> threat to the safety of a child, officials may temporarily deprive a parent of
> custody without parental consent or court order.'

*Patterson*, 141 F.Supp.2d at 530-31 (quoting *Hollingsworth v. Hill*, 110 F.3d 733,

739 (10th Cir. 1997)).

Plaintiffs allege that "there was no emergency circumstance to justify

deprivation of custody without parental consent or a court order." (Doc. 46, ¶

191).[20]  Defendants argue that Plaintiffs cannot state a procedural due process

claim "by simply complaining that the seizure of A.F. was unreasonable." (Doc.

115, p. 12).  Even if they could, however, the analysis the Court performed above

in relation to Plaintiffs' alleged Fourth Amendment violations informs our

determination here.  Because we have already determined that A.F. was "in

imminent danger of serious bodily injury and that [defendants'] intrusions were

reasonably necessary to avert that injury," *Good*, 891 F.2d at 1095, we also

conclude that emergency circumstances existed justifying depriving Plaintiffs of

her custody, as required by 23 Pa. C.S. § 6315(a)(1).[21]

---

[20]     Plaintiffs do not argue that they did not receive a prompt post-deprivation hearing in a meaningful time and manner.  Thus, there is no need to address the due process Plaintiffs received after A.F. was taken from their custody.

[21]     23 Pa. C.S. § 6315(a)(1) provides that deprivation of custody may lawfully occur pursuant to 42 Pa.C.S.A. § 6324.  Therein, language states that "[a] child may be taken into custody: . . . (3) By a law enforcement officer or duly authorized officer of the court if there are reasonable grounds to believe that the child is suffering from illness or injury or is in imminent danger from his surroundings, and that his removal is necessary."

Plaintiffs attempt to argue that no emergency circumstance existed because the HMC Defendants could have waited an additional one hour and forty minutes to two hours to take custody of A.F.  Specifically, Plaintiffs point out that the Hepatitis B vaccine that Defendants viewed as necessary could have been effectively administered within a twelve hour window from birth, so Defendants could have waited one hour and forty minutes longer before taking custody of A.F. to administer the vaccine.[22]  Such a delay, Plaintiffs assert, could have allowed for Mr. Ferris to return to the hospital as Mrs. Ferris requested, and further supports their argument that A.F. was not in "immediate" danger.

We disagree with this argument.  Plaintiffs cite to no case law indicating a requirement that state actors wait until the last possible moment to take custody of a child.  Indeed, such a policy would be dangerous and counter to the motivations behind the custody deprivation process, which allows government officials to act in the best interests of the child when they perceive an "imminent" threat to exist, and not at the last possible point that intercession could prevent such a threat from materializing.  Furthermore, Plaintiffs fail to explain why waiting an additional two hours for Mr. Ferris would have changed the circumstances whatsoever, when all parties agree that both Mr. and Mrs. Ferris had consistently refused to consent to a

---

[22]     Twelve hours from A.F.'s birth would have been 10:00 p.m. on the evening of June 27, 2010.  While the time that Defendants took custody of A.F. is disputed, the parties agree that Judge Hoover issued the court order at 8:00 p.m. and the medical treatments began at 8:20 p.m.

variety of treatments while Mr. Ferris was indeed present.  Finally, Defendants'

expert suggests that certain treatments can take up to one hour to obtain and/or

prepare for, and so Defendants were acting with reasonable caution by instituting

the deprivation slightly earlier in time.

These arguments bolster our determination that a policy requiring state

actors to wait until the last possible time period to institute custody deprivation

proceedings where they otherwise perceive emergency circumstances to exist, as

Plaintiffs recommend, would be both dangerous and unwise: such a policy would

recklessly endanger the welfare of the children the state endeavors to protect.

Thus, we decline to entertain Plaintiffs' arguments in this regard.  *See Miller*, 174

F.3d at 373 (refusing to find a procedural due process violation where plaintiffs

suggested an alternative procedure that was not practical, "would frustrate the

purpose of the Juvenile Act and would bog down the statute with 'procedural

technicalities and costly litigation.'").  Rather, we conclude that Defendants were

reasonable in their assessment that A.F. was in imminent danger from her

surroundings, and thus emergency circumstances existed to justify the deprivation

of custody such that a Fourteenth Amendment violation did not occur.[23]

---

[23]        As with the HMC Defendants' Fourth Amendment qualified immunity defense, here too
Defendants assert the defense of qualified immunity.  As we have determined that no Fourteenth
Amendment violation in fact occurred, we find that the first question posed in a qualified
immunity analysis shows that Defendants are indeed entitled to such a defense.  We further note
that, had a Fourteenth Amendment violation in fact occurred, Defendants would not have
violated a constitutional right that was so clearly established as to put Defendants on notice that

### C.     Claims Against Defendant Lopez-Heagy

Having resolved the claims against the HMC Defendants, we turn now to the claims Plaintiffs assert against Defendant Lopez-Heagy.  These include allegations of Fourth and Fourteenth Amendment violations as well as a state law false imprisonment claim.  While the parties agreed to sufficient factual allegations allowing the Court to make a determination regarding the HMC Defendants' conduct, the parties dispute significantly more factual matter in relation to Defendant Lopez-Heagy's interaction with Plaintiffs.

The parties agree that the HMC Defendants contacted Defendant Lopez-Heagy, and that she arrived at the hospital at approximately 4:30 p.m. in the afternoon on June 27, 2010.  (Doc. 111, p. 7).  As noted above, at that time, the HMC Defendants allege that Plaintiffs were not consenting to any testing or treatment for A.F., while Plaintiffs allege that they had consented to a white blood cell count, Hepatitis B testing, and to a vitamin-K injection if A.F. had not yet received one, but to none of the other recommended treatments.  Significantly, the treatments refused included the application of triple-dye ointment, erythromycin, a Hepatitis B vaccine, and the 48-hour observation of A.F. for signs of sepsis, jaundice, and other complications.

their conduct was constitutionally prohibited.  *See Wilson*, 382 Fed. Appx. at 152.  Rather, as discussed above, a reasonable person in Defendants' position would have acted as Defendants did and Defendants are thus entitled to qualified immunity.

Plaintiffs allege that Defendant Lopez-Heagy arrived and began to speak with Mrs. Ferris.  Plaintiffs further allege that Defendant Lopez-Heagy demanded that Mrs. Ferris allow "any and all medical treatment that the hospital wanted to do regardless of [the Ferris'] wishes." (Doc. 112, ¶ 52).  Defendant Lopez-Heagy however asserts that she told Plaintiffs that HMC was willing to compromise and provide A.F. "with only the minimum care needed."  (Doc. 101, ¶ 51-52).  Further, Mrs. Ferris says that Defendant Lopez-Heagy "threatened" that A.F. would be taken away should she fail to cooperate after Mrs. Ferris asked about the allegations against Plaintiffs.  Defendant Lopez-Heagy says that while she did make such a statement, it was not made as a threat in retort to Mrs. Ferris' questions about the allegations against her.  Significantly, the parties also dispute whether a written safety plan was ever presented to Mrs. Ferris.  Plaintiffs allege that Defendant Lopez-Heagy asked Mrs. Ferris to consent to the plan without ever providing it for her review, while Defendant Lopez-Heagy asserts that she provided it to Mrs. Ferris long before contacting police, but that Mrs. Ferris refused to sign it.  (Doc. 112, ¶¶ 55-56, 61).

The parties also dispute Defendant Lopez-Heagy's role in the activities of the Derry Township Police investigation.  Defendant Lopez-Heagy alleges that she "formulated and made a recommendation to the Police Department's Sergeant Ferree requesting that the Police Department take A.F. into protective custody."

(Doc. 102, p. 14).   Based on Defendant Lopez-Heagy's report, Dauphin County

Assistant District Attorney Fran Chardo informed Sergeant Ferree that the Police

Department was able to take protective custody of A.F.   (*Id*.).   Upon arriving at the

hospital, however, Defendant Lopez-Heagy alleges that the police performed an

independent investigation that including speaking with Defendant Lopez-Heagy.

Ultimately, Defendant Lopez-Heagy alleges, Officer Bell reached the conclusion

taking A.F. into protective custody was the appropriate action independently.   (*Id*.;

Doc. 112, ¶¶ 66- 68).

Plaintiffs allege that Defendant Lopez-Heagy had a more active role in

Officer Bell's investigation.   Specifically, they allege that Officer Bell arrived and

was told that "[Defendant Lopez-Heagy] needs to have paperwork signed." (Doc.

112, ¶ 67).   Rather than conducting an independent investigation, Defendant

Lopez-Heagy had already drawn up paperwork for the deprivation of custody, and

that the officers' "hands were tied" once Defendant Lopez-Heagy called them.

(Doc. 112, ¶ 68).   While the allegations concerning the paperwork are supported by

the record, this Court cannot find any reference to the Plaintiffs' quote that the

officers said their hands were tied.[24]   Keeping these disputes in mind, and viewing

---

[24]      Plaintiffs state that this quote is supported by the record at Lopez-Heagy S.J. Exhibit "A"
at 282:3-283:9.  While this exhibit was included on the docket, this Court has been unable to
locate the pages indicated, let alone the liens recited above.  Regardless, as explained in further
detail below, we do not find it instrumental in our analysis.

all factual inferences in the light most favorable to Plaintiffs, we proceed to consider the claims alleged and Defendant Lopez-Heagy's arguments in defense.

### i.    Absolute Immunity

Defendant Lopez-Heagy first argues that she is entitled to absolute immunity from Plaintiffs' claims.  (Doc. 102, p. 9-10).  The Third Circuit has held that social workers are "entitled to absolute immunity for their actions in petitioning and formulating and making recommendations to the State Court because those actions are analogous to the functions performed by state prosecutors, who were immune from suit at common law." *Ernst v. Children Review Servs. of Chester Cnty.*, 108 F.3d 486, 493 (3d Cir. 2009).  Defendant Lopez-Heagy argues that this Court should extend this immunity from recommendations to the State Court to further include recommendations to a law enforcement officer, physician, or hospital personnel.  In support of this argument, Defendant Lopez-Heagy explains that she would have immediately initiated a dependency proceeding in State Court, and received the protection of absolute immunity for her actions, had such a route been available to her.  Only because the events happened to occur on a Sunday and the court was closed was Defendant Lopez-Heagy unable to initiate a dependency proceeding and thus contacted the police officers instead.  (Doc. 117, p. 3).

We initially considered the issue of absolute immunity in Defendant Lopez-Heagy's Motion to Dismiss.  (Doc. 20).  We previously emphasized that *Ernst*

limited absolute immunity  to actions taken in petitioning the judiciary and noted that it does not extend to "investigative or administrative actions . . . outside the context of a judicial proceeding." *Id.* at 497 n.7.  In *Bowser v. Blair County Children and Youth Servs.*, 346 F.Supp.2d 788, 793-94 (W.D.Pa. 2004), the Western District Court of Pennsylvania concluded that the act of social workers taking a child into custody pursuant to an emergency order of a court initiates the process of adjudicating dependency such that absolute immunity is invoked. *Bowser*, 346 F.Supp.2d at 793.  Thus, any actions Defendant Lopez-Heagy might have taken after Judge Hoover initiated his order would be protected by absolute immunity.  As the Plaintiffs observe, however, the actions that comprise the alleged constitutional violations occurred prior to the time that the order was issued, and Defendant Lopez-Heagy did not initiate a judicial proceeding until the day after she committed the alleged constitutional violations.  Rather, her actions in speaking to Plaintiffs and Officer Bell were of an investigative and administrative nature.  We concur with Plaintiffs, and thus we reiterate our previous holding and cannot conclude that the prosecutorial immunity afforded to social workers in the judicial setting applies to these facts.

### ii.    Fourth Amendment Claim Against Defendant Lopez-Heagy

We turn now to Plaintiffs' Fourth Amendment claim against Defendant Lopez-Heagy.  Plaintiffs' primary argument against a ruling in favor of Defendant

Lopez-Heagy is that genuine disputes of material fact exist that would preclude such a ruling.  (Doc. 111, pp. 11-13).

Again, in order to show a Fourth Amendment violation, "a plaintiff must show that the defendants' actions (1) constituted a "search" or "seizure" within the meaning of the Fourth Amendment, and (2) were "unreasonable" in light of the surrounding circumstances." *Adkins*, 2005 WL 2129921, at *7.  Unlike the HMC Defendants, Defendant Lopez-Heagy argues that she did not take custody or seize A.F. at any time; rather she argues that the police officers and hospital staff were responsible for such action.  Defendant Lopez-Heagy further argues that her actions were reasonable under the circumstances.  Finally, Defendant Lopez-Heagy argues that if this Court finds that a constitutional violation did indeed occur, she is entitled to qualified immunity, thereby precluding a finding that she is liable to Plaintiffs for her actions.

We first consider whether Defendant Lopez-Heagy actually seized A.F. for purposes of a Fourth Amendment claim.  Plaintiffs agree that Defendant Lopez-Heagy did not physically seize A.F.  (Doc. 111, p. 16).  Rather, they argue that "even though Defendant Lopez-Heagy did not physically seize A.F. herself, she was more than just a passive observer." (*Id.*).  The parties agree that Defendant Lopez-Heagy spoke with Officer Bell and provided her opinion to him based on her conversations with the HMC medical staff and Plaintiffs.  Further, the record

indicates that Defendant Lopez-Heagy had prepared the necessary paperwork for the authorities to take custody of A.F. prior to Officer Bell's arrival at the hospital, though Officer Bell ultimately signed it.  (Doc. 112, ¶ 68).

"Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred."  *U.S. v. Smith*, 575 F.3d 308, 312 (3d Cir. 2009) (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)).  Whether an encounter constitutes a seizure within the meaning of the Fourth Amendment "requires consideration of 'all the circumstances surrounding the encounter.'"  *Id.* (citing *Bostick*, 501 U.S. at 439).  Here, the parties agree that Defendant Lopez-Heagy had no actual authority to seize A.F.  Indeed, a social worker is not capable of taking a child into emergency protective custody on his or her own accord.  *See* 23 Pa. C.S.A. § 6315(a).[25]  The parties further agree that at no time did Defendant Lopez-Heagy erroneously allege that she had this power.

---

[25]  As noted above and repeated herein for the convenience of the parties, 23 Pa. C.S.A. § 6315(a) references 42 Pa. C.S.A. § 6324, which provides that a child may be taken into custody:

    (1)    Pursuant to an order of the court under this chapter. Prior to entering a protective custody order removing a child from the home of the parent, guardian or custodian, the court must determine that to allow the child to remain in the home is contrary to the welfare of the child;

    (2)    Pursuant to the laws of arrest;

    (3)    By a law enforcement officer or duly authorized officer of the court if there are reasonable grounds to believe that the child is suffering from illness or injury or is in imminent danger from his surroundings, and that his removal is necessary.

A social worker does not have the authority to independently deprive a parent of custody.

Rather, Plaintiffs allege that Officer Bell acted at the direction of Defendant Lopez-Heagy, and that it was her show of authority as a "principal actor," (doc. 111, p. 13), that led Officer Bell to direct the HMC medical staff to seize A.F. However, the record lends absolutely no support to this allegation. Rather, it appears that Defendant Lopez-Heagy acted within the confines of her position by interviewing the HMC medical staff and relaying the information that they provided to her to Sergeant Ferree and Assistant District Attorney Chardo. This information contained the medical staffs' reasonably formed opinion that A.F. was in imminent danger should she not receive medical treatment that the staff viewed as necessary, as we have already determined above. Defendant Lopez-Heagy also relayed this information to Officer Bell when he arrived at the hospital. A careful review of Officer Bell's deposition shows that it was not Defendant Lopez-Heagy's opinion or her authority that constituted the sole foundation for his conclusion that depriving Plaintiffs of custody was appropriate under the circumstances, as Plaintiffs allege—rather Officer Bell conducted his own independent determination to reach this conclusion, thereby precluding Defendant Lopez-Heagy from assuming an authoritative role in the seizure.

The record indicates that Officer Bell spent a significant amount of time with both Mrs. Ferris and HMC medical staff, in addition to his conversation with Defendant Lopez-Heagy. (*See generally*, Doc. 100-19). However, rather than

rely on these opinions, Officer Bell clearly states that the primary impetus for his decision to authorize the deprivation of custody was derived from the opinions of his supervisors.  Specifically, Officer Bell reached his conclusion because the information relied upon by Sergeant Ferree and Assistant District Attorney Chardo in advising Officer Bell that it was legally permissible for him to order the deprivation of custody of A.F. was identical to the information that Officer Bell ascertained from both Defendant Lopez-Heagy and the HMC medical staff upon arriving at the hospital.  (Doc. 100-19, 18:22-19:22).  Thus, Officer Bell's investigation took the form of searching for any discrepancies between the information relayed to his supervisors and the facts of the situation as he observed them.  Officer Bell found no such discrepancies after speaking directly to the medical staff and Mrs. Ferris, (*see* Doc. 100-19, 13:12-18;[26] 20:20-21:9 (explaining that "if I'm going to get any type of information regarding the status of [a patient], we always wait and actually try to speak with the doctor versus nursing staff.")) in addition to Defendant Lopez-Heagy.  This determination ultimately led to his decision; Officer Bell was clearly not unduly influenced by Defendant Lopez-

---

[26]    This portion of Officer Bell's testimony emphasized that "[a]fter reviewing the paperwork, I just discussed with [the hospital staff] what was in the paperwork and verifying that everything that was in the paperwork that was drawn up was true and correct . . . ." (Doc. 100-19, 13:12-18).  Further, Officer Bell also stated that he "discussed with the medical staff that there are reasonable grounds to believe that the child is suffering from an illness or injury and is in imminent danger . . . ." (*Id.*, 16:33-17:3).

Heagy.[27]  As such, while Defendant Lopez-Heagy certainly played a role in the

seizure of A.F., we cannot find that, based on the record before us, her involvement

rose to the level necessary to actually seize A.F.  Without a finding that a seizure in

fact occurred, it is this Court's determination that Plaintiffs' Fourth Amendment

allegations against Defendant Lopez-Heagy must fail.

### iii.    Fourth Amendment Qualified Immunity

Even if the record had showed the existence of a colorable claim for a

Fourth Amendment violation, Plaintiffs claim would still fail because Defendant

Lopez-Heagy is entitled to qualified immunity.

Plaintiffs emphasize that Defendant Lopez-Heagy acted unreasonably in

three disputed instances: first, Plaintiffs allege that they asked about the allegations

against them, and Defendant Lopez-Heagy responded that if Plaintiffs did not

cooperate with Defendants, A.F. would be taken into protective custody, thereby

making Mrs. Ferris "feel threatened."  (Doc. 111, p. 16 (similarly noting that

Defendant Lopez-Heagy "threatened to call the police if Jodi 'refused to

cooperate'").  Defendant Lopez-Heagy denies responding to Mrs. Ferris' queries

about the allegations against Plaintiffs with a threat to call the police.  Rather,

Defendant Lopez-Heagy indicates that she explained the allegations against

---

[27]     Even if Plaintiffs could accurately point to the single statement in the record that Officer
Bell's "hands were tied" once Defendant Lopez-Heagy called the police, the existence of this
statement would not be sufficient to contradict pages of Officer Bell's deposition testimony
outlining his independent and entirely appropriate investigation of the circumstances surrounding
his decision that A.F. was sufficiently endangered.

Plaintiffs and then further explained that if Plaintiffs refused to cooperate, A.F. would be taken into custody.  (Doc. 112, ¶¶ 49-50).

This dispute amounts to a disagreement over the order of the conversation between Defendant Lopez-Heagy and Plaintiffs.  As such, it does not amount to a genuine dispute of material fact.  While Mrs. Ferris may have felt threatened by the statement Defendant Lopez-Heagy made regarding the consequences of Plaintiffs' refusal to cooperate, it was ultimately Defendant Lopez-Heagy's responsibility to relay this information to Plaintiffs and she did not act unreasonably in doing so. Furthermore, the parties agree that Defendant Lopez-Heagy explained the allegations against Plaintiffs, and did not withhold this important information. (Doc. 112, ¶ 49).

Next, Plaintiffs allege that Defendant Lopez-Heagy told the police to remove A.F. from Plaintiffs' custody, thereby precluding Officer Bell from conducting an independent investigation.  (Doc. 111, p. 16).  As noted above, we concur with Plaintiffs that Defendant Lopez-Heagy was "more than just a passive observer" in the investigation conducted by Officer Bell.  Defendant Lopez-Heagy does not dispute that she gave her opinion to Officer Bell regarding custody measures, or that she drew up the paperwork for the custody of the child by the time the police arrived.  Rather, Officer Bell's testimony indicates that no protocol exists on who should draw up the appropriate documentation.  (Doc. 100-19, 26:23-27:5).

Further, while Defendant Lopez-Heagy's opinion was taken into account, Officer Bell clearly testifies that it was the opinion of his supervising officer, Sergeant Ferree, and Assistant District Attorney Chardo that he relied upon in formulating his opinions.  While Ferree and Chardo based their opinions on the information relayed to them by Defendant Lopez-Heagy, Officer Bell was careful to verify that information before drawing his own conclusions in support of their opinions.  By reporting her opinion as well as the information she had gathered, Defendant Lopez-Heagy was not acting unreasonably but rather was performing the necessary functions of her job.

Finally, the parties dispute whether Defendant Lopez-Heagy ever provided a written copy of the safety plan for Plaintiffs' review.  Even presuming that she did not provide one, we do not find that this singular failure rises to the level of unreasonable conduct such that Defendant Lopez-Heagy should have been aware that she was violating Plaintiffs' constitutional right.

Based on the foregoing analysis, we cannot conclude that Defendant Lopez-Heagy acted unreasonably under the circumstances, such that she would have had cause to know that her actions were in danger of violating the Fourth Amendment. Thus, we conclude that she is entitled to qualified immunity in regard to Plaintiffs' Fourth Amendment claims.

### iv.   Fourteenth Amendment Claim Against Defendant Lopez-Heagy

Plaintiffs assert a Fourteenth Amendment procedural due process claim against Defendant Lopez-Heagy that mirrors the claim asserted against the HMC Defendants.  We reiterate that "[c]ourts agree that 'in emergency circumstances which pose an immediate threat to the safety of a child, officials may temporarily deprive a parent of custody without parental consent or court order.'"  *Patterson*, 141 F.Supp.2d at 531; *Brown v. Daniels*, 128 Fed. App'x 910, 914-15 (3d Cir. 2005) ("It is well-settled that 'in emergency circumstances which pose an immediate threat to the safety of a child, officials may temporarily deprive a parent of custody without parental consent or an order of the court.'").  Again, Plaintiffs premise their Fourteenth Amendment claim solely on the assertion that "there was no emergency circumstance to justify deprivation of custody without parental consent or a court order." (Doc. 46, ¶ 191; Doc. 111, p. 20).  Plaintiffs do not challenge the constitutionality of the Pennsylvania laws governing protective custody.  Rather, Plaintiffs contend that Defendant Lopez-Heagy was not justified in her reliance on the HMC medical staff's opinion that an immediate threat existed regarding the safety of A.F. as that opinion was erroneous.  (Doc. 111, p. 20).

We disagree.  Courts within the purview of our Court of Appeals have held that a social worker is entitled to consider the professional opinions of medical staff when formulating his or her own opinion regarding custody deprivation.  For

example, in *Miller v. City of Philadelphia*, the district court for the Eastern District of Pennsylvania found that a social worker did not violate the plaintiff's substantive due process rights in relying on the medical report of Dr. Henretig, a CHOP physician who had examined the children at issue.[28] *Miller*, 174 F.3d at 371 (noting that "at his supervisor's request [the social worker] had the Miller children brought to CHOP for an examination, which ultimately led to briefly removing one child from plaintiff's custody). While in *Miller*, the court preserved the substantive due process claims to the extent that they alleged that the social worker had misrepresented certain medical reports, there has been no allegation here that Defendant Lopez-Heagy misrepresented the HMC Defendants' medical opinions. Rather, the investigation of Officer Bell confirmed that Defendant Lopez-Heagy restated both the facts and the opinions of the HMC Defendants accurately.

Here too, we find that Defendant Lopez-Heagy was justified in her reliance on the professional opinions of medical personnel. It comports with both reason and logic that an individual in Defendant Lopez-Heagy's position with no medical background should be entitled to such reliance. Having already determined that the opinion of the HMC Defendants was reasonable, we cannot conclude that

---

[28]     Specifically, the court found that the social worker had qualified immunity from appellants' substantive due process claims to the extent that they alleged that he pursued the Millers' case without probable cause. The district court declined to dismiss the Section 1983 substantive due process claims to the extent that they alleged that the social worker had misrepresented Dr. Henretig's medical report and induced the hospital to falsify records.

Defendant Lopez-Heagy should have disregarded their conclusions.  Rather, we once again find that sufficient evidence of the existence of emergency circumstances posing an immediate threat to the safety of a child were present, such that the deprivation was proper.  Therefore, no Fourteenth Amendment violation occurred.

Furthermore, as with our analysis above regarding Plaintiffs' Fourth Amendment claims, we further find that even if a violation had in fact occurred, Defendant Lopez-Heagy is entitled to qualified immunity, thereby precluding a finding that she is liable for such a violation.  Plaintiffs can point to no case law that would have placed Defendant Lopez-Heagy on notice that she was in danger of violating their constitutional right and her actions were not unreasonable such that she should otherwise have known that she was committing such a violation.[29]

### v.    False Imprisonment Claim

We turn now to Plaintiffs' final allegation, a Pennsylvania state law false imprisonment claim alleging that Defendant Lopez-Heagy unlawfully detained A.F. without the consent and over the objection of her parents.  "To state a claim for false imprisonment, a plaintiff must establish: (1) that she was detained; and (2)

---

[29]    Defendant Lopez-Heagy further notes that Plaintiffs have failed to address her defense of qualified immunity regarding their procedural due process claim.  As such, Plaintiffs have conceded the issue.  *Campbell v. Jefferson University Physicians*, 22 F.Supp.3d 478, 487 (E.D.Pa. 2014) ("[W]hen a plaintiff responds to a defendant's summary judgment motion but fails to address the substance of any challenge to particular claims, that failure 'constitutes an abandonment of th[o]se causes of action and essentially acts as a waiver of these issues.'") (internal citations omitted)).

that the detention was unlawful." *James v. City of Wilkes-Barre*, 700 F.3d 675, 682-83 (3d Cir. 2012) (citing *Wallace v. Kato*, 549 U.S. 384, 389 (2007)).

As we have already established, a child may be taken into custody under Pennsylvania law "[b]y a law enforcement officer or duly authorized officer of the court if there are reasonable grounds to believe that the child is suffering from illness or injury or is in imminent danger from his surroundings, and that his removal is necessary."  42 Pa. C.S.A. § 6324(3).  As we already concluded in realtion to the constitutional claims discussed above, both the HMC Defendants and Defendant Lopez-Heagy were reasonable in their determination that A.F. was in imminent danger from her surroundings, and that her removal was necessary. Therefore, to the extent that Defendant Lopez-Heagy played a role in the detention of A.F., if indeed any existed at all,[30] the detention was not unlawful.  Thus Plaintiffs have failed to make out a claim for false imprisonment.

## V.   CONCLUSION

The summary judgment motions of the Defendants in the instant case shall be granted in full, in accordance with the rationale set forth above.  In so doing, we reiterate the careful observations of the courts that have ruled on matters similar to those before us today: an individual in the position of the defendants here "rarely will have the luxury of proceeding in a deliberate fashion . . . ."  *Miller*, 174 F.3d at

---

[30]     As with her arguments in relation to Plaintiffs' Fourth Amendment claim, Defendant Lopez-Heagy disputes the allegation that she actually detained A.F. in any way.

375.  Rather, defendants are often confronted with difficult circumstances and are compelled to make decisions under time constrictions.  In performing this duty, Defendants here no doubt considered that an erroneous conclusion could well have led to the death of an infant.  As their decisions were reasonable and supported by clearly articulable evidence, they are entitled to summary judgment.  A separate order shall issue in accordance with this ruling.